No. 83-308

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

IN THE MATTER OF
ALAN RAY SHENNUM, Respondent.

---

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Jack L. Green, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Paterson, Marsillo, Tornabene & Schuyler; Charles W.
Schuyler and Larry Elison argued, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Robert F.W. Smith argued, Asst. Atty. General, Helena
Robert L. Deschamps, III, County Attorney, Missoula,
Montana: Robert Slomski argued, Deputy County Attorney,
Missoula, Montana

---

Submitted: January 23, 1984

Decided: June 19, 1984

Filed: JUN 1 9 1984

Ethel M. Harrison

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Alan Ray Shennum appeals from an order of the District Court, Fourth Judicial District, Missoula County, committing and confining him to Warm Springs State Hospital for a period of three months.

We determine in this case that the state failed to follow the statutory safeguards imposed upon the state when it sought the commitment of the respondent on the charge of being seriously mentally ill, and that such failure mandates reversal in this case. We set forth for any future proceedings the burden of proof imposed upon the state in such cases, the number of jurors necessary to reach a verdict, and answer respondent's contentions respecting the instructions given to the jury in this case.

On the evening of April 25, 1983, Shennum arrived early for a scheduled meeting of the Missoula City Council and seated himself next to Neil R. Smith in the public section of the council's chambers. Smith noticed that Shennum was wearing over his shirt an unconcealed shoulder holster attached to his body by ropes, and that in the shoulder holster he carried a .45 caliber semiautomatic pistol. Shennum began talking to Smith saying that Shennum was in the process of putting a stop to women voting and that women should not be allowed to hold public office. He was going to accomplish this through legislation. When Shennum asked Smith how many women were on the city council, Smith decided that he had better report the presence of Shennum in the council chambers to the officials. He feigned an excuse for leaving the city council chambers and reported the situation

to a woman at the City Police Office in the same building. Smith then left the building because he anticipated trouble.

The Missoula City Police Officers surrounded the council chambers to keep an eye on Shennum. In the meantime, one of the police officers informed arriving members of the city council. The city council held an emergency caucus in another room and passed an emergency ordinance to make it unlawful, except for law officers, to possess a gun in a city building. Because of the delay of the council in getting to the meeting at the scheduled time, people began leaving the council chambers, including Shennum. When he got to the council chamber door, Shennum was taken into custody by two officers who immediately disarmed him of his pistol. Police officers determined it was fully loaded and cocked with a live round in the chamber and with a fully loaded clip of seven rounds. In addition Shennum was carrying a fully loaded extra clip of .45 caliber ammunition in his shirt pocket.

Shennum was then taken by the officers to an interview room in the police department where he was questioned by the officers for thirty to forty minutes. The officers attempted to obtain some identification from him and to ascertain his purpose in being in the city council chambers with a loaded gun. Shennum had no identification on his person other than a printed business card which gave his address but not his name and which stated that he was a consultant to government and business. Shennum would reply only that he worked for all government agencies. The police officers had difficulty getting a positive identification from Shennum until they went to his car which was parked near the city council building. From the car, Shennum produced his driver's

license and other material that gave the police a positive identification.

Shennum was not placed under arrest or charged with an offense although the police retained his weapon. Shennum requested the return of his weapon, but the police officers told him that it would not be returned. Shennum indicated that he might get another gun anyway.

Stripped of his gun, Shennum either presented no further threat of danger to himself or to others in the community or the police officers were not doing their duty, because he was released into the night without any further precaution. It seems safe to assume that the police officers did not in fact ignore their duty, but saw no further threat in Shennum without his gun. No further action had been taken by the police when on the next morning, Shennum again appeared at police headquarters, requesting that his gun be returned to him.

The record is absolutely bare of what happened on the morning of April 26, when Shennum appeared to retrieve his gun. No person testified as to what occurred at the time. It is clear however, that when he came in the morning, Shennum was detained and a request was made through the county attorney's office for Shennum's mental examination by Dr. Charles E. Lear, a Missoula psychiatrist. The doctor came to the jail in the morning of April 26, and interviewed Shennum for 35 to 40 minutes. Later that day Shennum was transferred to the mental health unit of St. Patrick's Hospital in Missoula, Montana and Dr. Lear conducted a second interview of Shennum at the hospital on the following morning, April 27. On that date, Dr. Lear submitted a report on a prepared form. He placed a "X" on appropriate places on

- 4 -

the form to indicate that Shennum suffered from a mental disorder which affected his cognitive or volitional functions, and that the least restrictive situation which would provide him adequate care and supervision was commitment to Warm Springs State Hospital.

On April 27, the same day, the county attorney filed a petition alleging serious mental illness of Shennum and asking for his commitment to a mental health facility for not to exceed three months. On that day the court also signed a detention order requiring Shennum to be detained at the hospital until further order of the court. The minutes of the court reflect that Shennum was brought before the District Court with his court-appointed counsel and his court-appointed friend, and was there advised of his rights by the court. The court at that same time appointed an attorney to represent Shennum, a friend, Donald Louden, to protect his interests, and Michael W. Marks, a professional person of Shennum's choosing to examine him and testify at the hearing before the court. The court set May 4, 1983 for a hearing on the petition.

Shennum's counsel filed a request for a jury trial and the matter came on for trial before a jury on May 10, 1983. The jury returned a verdict on May 11, 1983, that Shennum was seriously mentally ill. After a further hearing, the order of commitment was signed by the district judge on May 12, 1983.

We will refer to other facts as we proceed in discussing the issues.

I.

The statutes for the commitment of a seriously mentally ill person do not present a model of intelligibility or

- 5 -

clarity. What is clear from them, however, is the concern of the legislature that procedural safeguards be placed around the power of the state to commit a person for serious mental illness.

That concern may be found in the definition of "seriously mentally ill" itself. It is defined as "a mental disorder which has resulted in self-inflicted injury or injury to others or the imminent threat thereof or which has deprived the person afflicted of the ability to protect his life or health." Section 53-21-102(14), MCA. The same statute defines injury as physical injury. It also provides that no person may be involuntarily committed to a mental health facilility or detained for evaluation because he is suffering from a mental disorder unless the condition causes him to be seriously mentally ill within the meaning of the definition. Section 53-21-102(14), MCA.

The state claims that it began proceedings against Shennum in this case under the emergency provisions of section 53-21-129, MCA. The pertinent portion of that statute provides:

> "When an emergency situation exists, a peace officer may take any person who appears to be seriously mentally ill and as a result of serious mental illness to be a danger to others or to himself into custody only for sufficient time to contact a professional person for emergency evaluation. If possible, a professional person should be called prior to taking the person into custody." (Emphasis added.)

As we have said earlier, the record is bare of what the situation was at the police station on the morning that Shennum was detained, and Dr. Lear called to evaluate him. We know from the record only, and that from Dr. Lear, that he had been called to come to the city jail to examine Shennum.

- 6 -

In his report and in his testimony at the hearing, Dr. Lear reports no physical injury or threat of physical injury at the county jail in the morning, reported to him or in his presence. In fact he relied in his report and in his testimony as proof that Shennum represented an imminent threat of injury, on the reports that Shennum had come to the city council the night before with a loaded gun, and that some days earlier he had come to the county courthouse and had filed his will. Those are the facts upon which Dr. Lear based his evaluation that Shennum presented an imminent threat of physical injury. The record shows, however, that from the time the police took the gun from Shennum, he made no threat of any kind against himself or anyone else. During the period of time that he was in the hospital, from April 27 and throughout his trial, he was kept in a room in the hospital with an open door, free to wander out into an open area nearby. The nurses had been advised that if he attempted to break out, that he should be allowed to do so and they should simply dial 911 to get emergency help. Nothing of that sort occurred. There is no showing in the record therefore of any circumstances existing on the morning of April 26, 1983 involving Shennum which would call to play the emergency provisions of section 53-21-129, MCA. It is also clear from the record that at no time prior to his examination by Dr. Lear, or until such time as he appeared in court on April 27, that Shennum was advised of his constitutional rights. Entirely lacking from the record is a finding by Dr. Lear on April 26, 1983, that an emergency situation existed at the city jail. That was a requisite for the further detention of Shennum in this case under the emergency statute. Section 53-21-129(2), MCA.

If no emergency existed on the morning of April 26, and we have no evidence that one did exist, then the procedure adopted by the state in committing Shennum, however proper the commitment may have been, deprived him of the procedural safeguards that the legislature has set up in the statutes when no emergency situation exists. For absent an emergency, it was the duty of the county attorney to proceed in accordance with sections 53-21-121 through 53-21-126, MCA, in order to commit Shennum as a seriously mentally ill person.

Under 53-21-121, the county attorney, upon the written request of any person, may file a petition setting forth the information required in that section. Although the petition filed by the county attorney in this case stated that the request was made by Dr. Lear for the filing of the petition, we find no written request in the record by Dr. Lear for proceedings to be instituted. Apparently the county attorney was relying on the form report of the medical examination submitted by Dr. Lear which had been incorrectly obtained from Shennum under the purported emergency situation.

After the petition was filed, it was the duty of the district judge to consider the petition and to find probable cause therefrom. Section 53-21-122, MCA. We have no doubt that probable cause was set forth in the petition, but there was no finding in the record of the district judge to that effect. There are minutes of the court which indicate that "the respondent was advised of his rights by the Court" on April 27, 1983. The statute requires that Shennum be advised of his constitutional rights, his rights under this "part" (apparently meaning his procedural rights under 53-21-115, MCA) and "the substantive effect of the petition." Section

- 8 -

53-21-122(2), MCA. Again the record is bare that Shennum was so advised.

Section 53-21-124, MCA, provides that the court may not order the detention of the respondent pending the hearing unless "requested by the county attorney and upon the existence of probable cause for detention." Here Shennum's counsel did not request a detention hearing, but that should be one of the rights which the respondent should be informed of at the time of his first appearance before the court.

The importance of these procedural steps in a commitment case cannot be exaggerated. These safeguards were inserted by the legislature because of the calamitous effect of a commitment: a deprivation of a person's liberty for up to three months (a period which may be extended) and the inevitable damage to a person's reputation. The California Supreme Court nailed it down when it said: "One has only to imagine the horror experienced by a competent person falsely committed as mentally disturbed in order to appreciate that freedom is openly on trial at a civil commitment proceeding." Estate of Roulet (Cal. 1979), 152 Cal.Rptr. 425, 590 P.2d 1, 3.

It is apparent from the commitment statutes that the intention of the legislature is that a person charged will be advised of his constitutional rights and other rights before an order for his mental evaluation by a professional person is made. In this case, when Shennum was advised on April 27, 1983, by the District Court of his rights, it was already too late. His mental evaluation by a doctor had occurred on the day before.

We respect the intention of the legislature in providing protective safeguards in commitment cases. Because those

- 9 -

safeguards were not observed by the state in the handling of Shennum's commitment, we reverse the commitment here.

Nothing in this opinion shall be held to prevent the state from proceeding properly to determine whether Shennum is seriously mentally ill after remittitur. Although Shennum in this case broke no law in carrying openly a loaded pistol into the council chambers, that does not appear to be normal behavior. (We remember the story of the masked bank robber who pointed a gun at the bank teller and said, "Give me your money and act normal." The bank teller, who had taken Psychology 101 said, "Define normal.") Whether in any future proceedings similiar actions constitute him an imminent threat to himself or to others, we leave to a trier of fact.

## II.

There are issues raised in this case which we must discuss since there is a possibility of some future commitment proceedings.

Counsel for Shennum contends that since a commitment for being seriously mentally ill has the effect of depriving the committed person of his liberty and damage to his reputation, the result is as serious as though criminal proceedings were brought against him. Therefore, counsel contends, the burden of proof on the state to commit Shennum should have been proof beyond a reasonable doubt.

By the same kind of reasoning he contends that the verdict of the jury should be unanimous instead of by two-thirds of the jurors.

Shennum cites the rule in California which is as he contends, but California has no controlling statute. We are controlled by the provisions of sections 53-21-126, MCA, which sets out the standard of proof in any hearing and which

- 10 -

also provides on trial by jury, two-thirds must concur in the finding that the respondent is seriously mentally ill. The statute further provides that the trial shall be governed by the Montana Rules of Civil Procedure.

The standard of proof required of the state in a commitment hearing is this:

> "(2) The standard of proof in any hearing held pursuant to this section is proof beyond a reasonable doubt with respect to any physical facts or evidence and clear and convincing evidence as to all other matters, except that mental disorders shall be evidenced to a reasonable medical certainty. Imminent threat of self-inflicted injury or injury to others shall be evidenced by overt acts, sufficiently recent in time as to be material and relevant as to the respondent's present condition." Section 53-21-127(2), MCA.

Counsel for Shennum also contends that the "trifurcated" legal standard of persuasion set forth in the foregoing statute is impossible to apply and confusing to a jury. We met that contention, however, in Matter of N.B. (Mont. 1980), 620 P.2d 1228, 1231, 37 St.Rep. 2031, 2034. There we set forth, and iterate here, that the statute's use of "reasonable medical certainty" means only a standard for the medical witnesses testifying in commitment proceedings. We stated that proof of mental disorders to a reasonable medical certainty is sufficient if with the other evidence in the case, the trier of facts is led to the conclusion that the serious mental illness exists by clear and convincing proof. Proof of physical facts, of course, must be proven beyond a reasonable doubt under the statute.

In Addington v. Texas (1979), 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323, the United States Supreme Court stated that "clear and convincing proof" is somewhere between a preponderance of the evidence and proof beyond a reasonable doubt. No further refinement of the term is necessary, in

our opinion. We see no difficulty in advising a jury that it must find by clear and convincing proof that the person charged is suffering from serious mental illness. The words "clear and convincing" import fairly well defined concepts which a person otherwise capable of sitting on a jury should have no difficulty in grasping. Addington permits that degree of proof in commitment proceedings.

Since the statute permits commitment proceedings to be governed by the Montana Rules of Civil Procedure, the provisions of the statutes, and of the Rules, for a two-thirds jury verdict are a sufficient indication of legislative intent and we will not require an increased number of jurors for a commitment verdict.

III.

There is no need, as counsel for Shennum contends, that the jury be instructed that a person should be advised of his constitutional rights before he is involuntarily detained or examined. Procedural matters are not matters for a jury to determine. Nor is it necessary for the District Court to instruct the jury on all the constitutional protections set out in the Montana Constitution or in the federal constitution. The court's duty with respect to instructions is only to state the law as applicable to the case and not to give abstract instructions.

Shennum also contends that the District Court should have granted his motion in limine to quash any statements made by Shennum to the police or to the doctor before the petition for his commitment was filed. We see no prejudice in the statements that he made to the police officers on the night of the gun incident, except of course that the statements were erratic and wandering. These are not

incriminating per se and there is no reason why such statements could not be given to the jury. In any future proceedings against Shennum he undoubtedly will have to be re-examined so his statements to Dr. Lear are moot as far as a future proceeding is concerned.

IV.

After the appeal was filed in this case, it appears from briefs that a petition was filed in Powell County for further detention of Shennum, and that proceedings there have been stayed pending this appeal. Because we reverse his original commitment from Missoula County, his further detention under section 53-21-128, MCA, is improper.

We therefore reverse the commitment of Alan Ray Shennum through the order of the District Court in Missoula County, and if he is still detained on remittitur we direct the county attorney of Missoula County to proceed with all deliberate speed to procure the release of respondent Shennum insofar as his further detention depends on the original commitment from Missoula County. Nothing herein bars further proceedings properly followed in this matter.

_____
Justice

We Concur:

_____
Chief Justice

_____

- 13 -

_L. C. Gulbrandson_

_____

_____
Justices

Mr. Justice Frank B. Morrison, Jr. respectfully dissents as follows:

The majority opinion is a mystery. First, reliance is placed upon Estate of Roulet (Cal. 1979), 152 Cal.Rptr. 425, 590 P.2d 1, wherein the California Supreme Court eloquently stated that freedom was openly on trial in a civil commitment proceeding. The California Court held that, where liberty is at stake, as in a civil commitment proceeding, constitutional rights attach affording right to a unanimous jury verdict and "proof beyond a reasonable doubt."

In rejecting Shennum's contention that he is entitled to a unanimous jury verdict and a requirement that the State prove the case beyond a reasonable doubt, the majority then distinguishes the Roulet case. The majority states:

> "Shennum cites the rule in California which is as he contends, but California has no controlling statute. We are controlled by the provisions of sections 53-21-126, MCA, which sets out the standard of proof in any hearing and which also provides on trial by jury, two-thirds must concur in the finding that the respondent is seriously mentally ill. The statute further provides that the trial shall be governed by the Montana Rules of Civil Procedure."

First of all, the majority is wrong. The California case did involve the constitutionality of California statutes which allowed the taking of liberty in a "civil commitment" proceeding without benefit of due process guarantees afforded criminal suspects. Secondly, elementary constitutional law teaches that statutes in conflict with the Constitution cannot stand. Therefore, if constitutional rights attach to one threatened with loss of liberty in a "civil commitment" proceeding, then statutes in conflict with those rights must necessarily fall.

The majority further confuses the issue by saying:

> "It is apparent from the commitment statutes that the intention of the Legislature is that a person charged will be advised of his Constitutional rights and other rights before an order for his

mental evaluation by a professional person is made." (emphasis added)

Again, it seems elemental that if constitutional rights have attached they must be fully accorded, the statutes notwithstanding. The majority seems to concede that Shennum has constitutional rights where his liberty is threatened and yet seems to say those rights are defined in the statutes. Nonsense.

Shennum, facing a deprivation of liberty in a civil commitment proceeding, should be entitled to the panoply of constitutional rights afforded an accused. These include the right to remain silent, the right to counsel, unanimous jury verdict and requiring the State to prove the case beyond a reasonable doubt.

The majority result is unclear. The case is unusual for there is nothing to retry. Shennum is no longer incarcerated. I would simply hold that what went before is a nullity and the statutes which conflict with well established constitutional principles are void.

Justice

Mr. Justice Daniel J. Shea dissents and will file a written dissent later.

16

DISSENT OF MR. JUSTICE DANIEL J. SHEA

No. 83-308

IN THE MATTER OF ALAN RAY SHENNUM

FILED

JAN 3 - 1985

Ethel M. Harrison
CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea, dissenting:

I agree with the dissent of Mr. Justice Frank B. Morrison, and would require proof beyond a reasonable doubt in order to commit a person to a mental health institution.

The Fourteenth Amendment to the United States Constitution and ARt. II, § 17 of our own Constitution requires that a person cannot be deprived of his liberty without due process of law. The majority concedes that a person must be advised of his Constitutional rights before being committed in a civil proceeding. In criminal matters, due process requires proof beyond a reasonable doubt in order to deprive a person of his liberty. Civil commitment presents the same type of serious infringement upon individual liberty as does criminal incarceration. Also, commitment to a mental health institution can have a detrimental effect upon the way in which society perceives the committed person. The same due process standard applied to criminal commitments should therefore be applied to civil commitments and proof beyond a reasonable doubt should be required.

_Daniel J. Shea_
Justice