No. 86-297

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

RUTH E. REISER,

        Plaintiff and Appellant,

   -vs-

DR. WILLIAM S. PRUNTY, M.D., and
BOZEMAN DEACONESS FOUNDATION, d/b/a
BOZEMAN DEACONESS HOSPITAL,

        Defendants and Respondents.

APPEAL FROM: District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Thomas A Olson, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Paul B. Smith, Boulder, Montana

    For Respondent:

        Crowley Law Firm; Bruce R. Toole, Billings, Montana
Berg, Coil, Stokes & Tollfesen; Ben Berg, Jr.,
Bozeman, Montana

Submitted on Briefs: Sept. 18, 1986

Decided: October 30, 1986

Filed: OCT 30 1986

_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Plaintiff Ruth Reiser appeals an order issued by the District Court of the Eighteenth Judicial District, Gallatin County, granting defendants Bozeman Deaconess Hospital and Dr. William Prunty's motions for summary judgment and denying Ruth Reiser's motion for partial summary judgment on the issue of liability for violations of Montana's mental health code, § 53-21-101, et seq., MCA (1979). We affirm.

The issue raised on appeal is whether the District Court erred in granting Dr. William Prunty's and Bozeman Deaconess Hospital's motions for summary judgment and denying Ruth Reiser's motion for partial summary judgment.

Mrs. Reiser's action against the hospital and Dr. Prunty arises out of involuntary commitment proceedings initiated by her family and the county attorney after Mrs. Reiser threatened to commit suicide. The facts indicate that in the early morning hours of November 3, around 3:00 a.m., and after drinking a bottle of wine, Mrs. Reiser telephoned Dr. Fred Bahnson, a physician who had been treating Mrs. Reiser for ear problems, and told him that she was drunk, unable to face the pain of her ear condition, and considering killing herself. Dr. Bahnson called Phyllis Rigg, Reiser's daughter, who called the Gallatin County Sheriff's office. Dr. Bahnson also contacted Mrs. Reiser's family physician, Dr. Hathaway, whom Mrs. Reiser had called prior to calling Dr. Bahnson. Dr. Hathaway told Dr. Bahnson that he knew little about Mrs. Reiser's mental condition, but suspected that she was very disturbed.

Prior to taking action the sheriff's office personnel spoke to Dr. Hathaway and confirmed that he had stated he felt Mrs. Reiser was disturbed. In that conversation, Dr. Hathaway suggested a call to Dr. William Prunty, a psychiatrist who had at one time treated Mrs. Reiser. Dr. Prunty reported that he had not seen Mrs. Reiser in over five years and could not form an opinion about her current mental condition.

Acting on this information, Deputy Cashell, who had come to the Reiser residence a month before for an earlier suicide attempt, met Mrs. Reiser's son, Ken Reiser, and daughter, Phyllis Rigg, at Mrs. Reiser's home. Before her brother arrived, Phyllis Rigg explained to Deputy Cashell and another officer on the scene that her mother had been very depressed, barricaded in her house for a week and that she had a loaded shotgun under her bed. When Ken Reiser arrived with a key to the house, Deputy Cashell telephoned Mrs. Reiser through the dispatcher in an attempt to get her to come out and talk to the officers. Although the telephone was answered, no one was thought to be on the receiver. Deputy Cashell then rang the doorbell to have Mrs. Reiser answer the front door. Mrs. Reiser did not answer. Using Ken Reiser's house key the officers entered the house where they met and identified themselves to Mrs. Reiser, who became very angry, yelling that she had not called anyone for help, that it was her life and she could do what she wanted with it and that she had a loaded gun and would shoot the officers if they entered her home. Deputy Cashell then asked Ken Reiser to come into the home and see if he could talk to his mother. When he was unable to talk to her, he requested that his sister be brought in. The police report indicates that as Ken and

Phyllis talked to their mother the mother became very abusive toward her children and stated several times that she wanted everyone to leave and that if she wanted to die, it was her privilege. She also repeatedly stated that she had a shotgun in the house and would kill everyone in the house. During the balance of the confrontation, Mrs. Reiser was across the living room, approximately 30 feet from the entryway where the officers stood. When Ken and Phyllis entered, they approached their mother, and Ken attempted to get behind her to block her way to the bedroom, where he knew she kept the shotgun. Before he was able to do so, she bolted. Deputy Cashell caught her, and with the assistance of the other officer was able to place her in a living room chair. While the officers were scuffling with his mother, Ken Reiser went into the bedroom to retrieve and unload the shotgun, which he placed on the floor in the hallway. Mrs. Reiser was then taken to Bozeman Deaconess Hospital by ambulance. She was admitted to the hospital at 4:30 a.m. on November 3 by Dr. Hathaway, Ruth Reiser's general physician.

Dr. Prunty testified that around 4:00 a.m. on November 3, he received a call from Dr. Hathaway informing him that Ruth Reiser was suicidal, was being admitted to the hospital, and that Dr. Hathaway was placing her in a "secure" room for her own safety. Dr. Hathaway indicated that he wanted Dr. Prunty to take over caring for Mrs. Reiser. Dr. Prunty then called the nurses on duty and arrived at the hospital around 5:30 a.m. He attempted to meet with Mrs. Reiser, but she was very uncooperative and refused to talk to him. Dr. Prunty then called Phyllis Rigg, who told him that her mother, Mrs. Reiser, had suffered depression and had on separate occasions threatened and attempted to commit suicide. Phyllis also

- 4 -

shared a long list of other troubles her mother had been experiencing.

Dr. Prunty explained the involuntary commitment procedure and was told that the daughter would see the county attorney without delay. Based on all of the information he had received and Mrs. Reiser's upset state, Dr. Prunty continued her confinement in the secure room and prescribed a sedative for her. Later in the afternoon of November 3, Dr. Prunty confirmed the daughter had requested the county attorney to initiate involuntary commitment proceedings.

Dr. Prunty saw Mrs. Reiser again that afternoon and found her more controlled, though angry at her confinement. She denied much of her daughter's information and requested medical care for other ailments, which was arranged. At that time, Dr. Prunty told her that her daughter was planning to institute commitment proceedings. By 5:00 p.m. on November 3, Dr. Prunty was able to confirm that deputy county attorney Robert Throssell had filed a petition for involuntary commitment and an order had been signed by the District Court judge finding probable cause that Mrs. Reiser was seriously mentally ill.

Although the district judge signed the order on November 3, the initial hearing on the commitment proceedings was set for Wednesday, November 5. This was because Tuesday, November 4, was a national and state election day. The next regular business day was the 5th.

Once the commitment proceeding was underway, the county attorney's office notified Dr. Prunty and the hospital that Mrs. Reiser should be held at the hospital pending further notice. Sheriff's deputies arrived at the hospital at about 12:30 p.m. on Wednesday, November 5, to take Mrs. Reiser to

the commitment hearing. Mrs. Reiser did not return to the hospital. She was released by the court on November 5 to the care of a friend. The order releasing Mrs. Reiser also appointed Dr. Frank Seitz, a psychologist, as the court-appointed professional required to examine Mrs. Reiser and report to the court on her condition. Dr. Seitz evaluated Mrs. Reiser and found that, at the time of his evaluation, Mrs. Reiser was not suicidal. Based on Dr. Seitz's report, the county attorney's office decided to dismiss the petition for involuntary commitment, and filed a motion to that effect on November 7. The motion was granted by the District Court that same day.

Mrs. Reiser brought this action in Gallatin County District Court seeking damages against Dr. Prunty and the Bozeman Deaconess Hospital for alleged violations of Montana's mental health code. She also sought recovery on the basis of the common law theories of assault, battery and false imprisonment.

Following discovery, the issue of liability for the mental health code violations was submitted to the District Court for adjudication on cross-motions for summary judgment. The motions of Dr. Prunty and the hospital were granted, and the plaintiff's motion for partial summary judgment was denied.

The issue raised by Mrs. Reiser on appeal encompasses an array of subissues. Each will be addressed in turn.

The first subissue involves appellant's contention that the District Court's order made a number of factual assumptions in the hospital's and Dr. Prunty's favor that require resolution by a trier of fact, hence summary judgment was improper. Mrs. Reiser's first contention is that she

never threatened suicide in her 3:00 a.m. telephone call to Dr. Bahnson. She argues that the District Court erred in assuming that the call was a threat. The District Court erred, she contends, because it failed to apply the rule established in Cereck v. Albertsons, Inc. (1981) that "all reasonable inferences drawn from the offered proof are to be drawn in favor of the party opposing summary judgment." 195 Mont. 409, 413, 637 P.2d 508, 511. Mrs. Reiser maintains that the reasonable inference to be drawn from her 3:00 a.m. call was that she was in pain and depressed, not that she was intending to kill herself. This Court cannot accept this contention as "reasonable" in light of the facts. It would not be "reasonable" to assume that a person in pain, who had been drinking, who had been very depressed for a week prior to the threat and who had a history of attempted suicide, including an attempt less than two months before the November 3 threat, was not threatening suicide. Mrs. Reiser admits that she made several calls at 3:00 a.m. and that she told Dr. Bahnson ". . . I might as well kill myself." Dr. Bahnson was aware of the above-mentioned facts. The sheriff's office knew of Mrs. Reiser's September 25, 1980 attempt at suicide. The only "reasonable" inference the District Court could draw is that Mrs. Reiser threatened suicide. The District of Columbia Circuit Court in addressing an issue where there was conflict concerning interpretation of the facts and the ultimate conclusion to be drawn from them but there was none as to the facts themselves, stated:

> Conflict concerning the ultimate and decisive conclusion to be drawn from undisputed facts does not prevent rendition of a summary judgment, when that conclusion is one to be drawn by the court. The court had before it all the facts which formal trial would have produced. Going through the motions of trial would have been futile.

- 7 -

Fox v. Johnson & Wimsatt (D.C. Cir. 1942), 127 F.2d 729, 737.

Further support for our ruling that there was no genuine issue of material fact precluding the District Court's order of summary judgment comes from the language of First National Bank Co. v. Insurance Company (1979), 606 F.2d 760, 767, where it is stated:

> Rule 56 does not provide a method by which the presence of an issue of fact can be determined; therefore, each case depends on the facts peculiar to it. A district court under the rule is not authorized to try issues of fact, but has the power to penetrate the pleadings and look at any evidential source to determine whether there is an issue of fact to be tried.

Mrs. Reiser's assertion that there is a genuine issue of fact as to whether her 3:00 a.m. call was a suicide threat is entirely without support in the record. The only interpretation and conclusion that could be drawn from the facts is that Mrs. Reiser was threatening suicide. Hence there was no genuine issue of material fact to preclude the District Court's order of summary judgment.

The next subissues appealed are whether Dr. Prunty and the hospital fulfilled their statutory obligations under §§ 53-21-115, 53-21-120, 53-21-129 and 53-21-146, MCA.

Mrs. Reiser's confinement in Bozeman Deaconess Hospital from November 3 to November 5 took place under the provisions of § 53-21-129, MCA, Montana's emergency detention statute. In November, 1980, the statute read as follows:

> (1) When an emergency situation exists, a peace officer may take any person who appears to be seriously mentally ill and as a result of serious mental illness to be a danger to others or to himself into custody only for sufficient time to contact a professional person for emergency evaluation. If possible, a professional person should be called prior to taking the person into custody.
>
> (2) If the professional person agrees that the person detained appears to be seriously mentally

ill and that an emergency situation exists, then the person may be detained and treated until the next regular business day. At that time, the professional person shall release the detained person or file his findings with the county attorney who, if he determines probable cause to exist, shall file the petition provided for in 53-21-121 through 53-21-126 in the county of the respondent's residence. In either case, the professional person shall file a report with the court explaining his actions.

Sections 53-21-129(1) and (2), MCA.

Subsection (2) of the statute is most relevant to the facts before this Court. It sets forth four criteria guiding the conduct of a "professional person" [1] in the care and evaluation of the seriously mentally ill:

1. Once a person is brought into custody, that person may not be detained unless a professional person concludes that the person appears to be seriously mentally ill and that an emergency situation exists with respect to that person's condition.

2. If the professional person concludes that these factors are present, then the person may be detained and treated until the next regular business day following this determination.

3. On the next regular business day, the professional person is obliged to either release the detained person or file appropriate findings with the county attorney, who may then seek involuntary commitment of the detainee pursuant to other provisions of the Mental Health Code.

4. Whether the professional person reports his findings to the county attorney or releases the detainee, the professional person is required to file a report with the district court explaining his actions with respect to the detainee.

None of the parties dispute this basic characterization of the legislative standards guiding the conduct of a professional person in the care and evaluation of a seriously

---

[1] A "professional person" is defined as a medical doctor or a State Department of Institutions certified practitioner in the mental health field; e.g., a psychiatrist or clinical psychologist. Section 53-21-102(10), MCA (1979).

mentally ill person. Mrs. Reiser's claim is that Dr. Prunty did not satisfy any of these statutory duties, and in particular that he did not determine an "emergency situation" existed warranting her confinement.

Section 53-21-102(4), MCA, defines an emergency situation as "a situation in which any person is in imminent danger of death or serious bodily harm from the activity of a person who appears to be seriously mentally ill." Seriously mentally ill means "suffering from a mental disorder which has resulted in self-inflicted injury or injury to others or the imminent threat thereof or which has deprived the person afflicted of the ability to protect his life or health." Section 53-21-102(14), MCA.

An emergency situation clearly existed in this case, and the information necessary for Dr. Prunty to draw this conclusion was available when he made the decision to detain Mrs. Reiser. The ambulance brought Mrs. Reiser to the hospital around 4:30 a.m. on the morning of November 3. By 6:00 a.m. that same morning, Dr. Prunty had talked to Dr. Hathaway and the sheriff's office personnel and had learned that Mrs. Reiser had not only threatened to kill herself, but others as well. He had tried to talk with Mrs. Reiser and found her to be angry and uncommunicative. He had been informed that she had been abusive toward the nurses. Before 8:00 a.m. he had talked with Phyllis Rigg and learned that Mrs. Reiser had made a suicide attempt within the last two months and that she had been very depressed for the week before November 3.

It is also clear from these facts that the District Court did not err in supporting Dr. Prunty's conclusion that Mrs. Reiser was seriously mentally ill and was a threat to

her own life. Dr. Prunty said his medical judgment was not based on a single fact or observation: "There's no one thing in most medical situations that point to a specific diagnosis and treatment. It's a group of bits of information and you put them together." Mrs. Reiser takes issue with how Dr. Prunty reached his conclusion that she had been suicidal, in that she never made an attempt or threat while under his care.

It must be noted that Dr. Prunty's alleged violation of accepted medical practice becomes a jury question only if Mrs. Reiser presents an expert witness who has a contrary medical view of the same facts. Mrs. Reiser presented no such witness. Under the law as expressed in Llera v. Wisner (1976) 171 Mont. 254, 557 P.2d 805, and Collins v. Itoh (1972), 160 Mont. 461, 503 P.2d 36 summary judgment was properly granted to Dr. Prunty on the question of his medical judgment.

Further, In The Matter of F.B. (1980), ___ Mont. ___, 615 P.2d 867, 869 interprets the statutory language "imminent threat of self-inflicted injury or injury to others" to mean:

> Threat is not a certainty. The law requires only proof beyond a reasonable doubt that the threat of future injury presently exists and that the threat is imminent, that is, impending, likely to occur at any moment. If beyond a reasonable doubt there is a present indication of probable physical injury which is likely to occur at any moment or in the immediate future, and if this injury would be a result of a mental disorder, then the person suffering from such mental disorder is seriously mentally ill within the meaning of the act.

In describing the behavior of a mentally ill person this Court explained that the behavior need not be a completed act. "An attempt or threat, or even a failure to act may suffice." Id. "Most certainly the legislature never intended that the blood of innocent people must first be shed

- 11 -

before the statutory definition of 'overt act' has been satisfied." In the Matter of J.B. (1985), ___ Mont. ___, 705 P.2d 598. In the instant case it is clear from the chronology of events that there was sufficient evidence to support both the hospital's and Dr. Prunty's decision to detain Mrs. Reiser as a threat to herself and others. Mrs. Reiser contends that:

> Dr. Prunty was detaining Ruth Reiser not because he felt that she continued to pose an imminent threat of death or serious bodily injury to herself or to others but merely because he felt she had posed a suicide threat to herself before she came to the hospital and he simply would hold and treat her while Phyllis Rigg, her daughter, and the county attorney proceeded with an involuntary commitment proceeding.

Mrs. Reiser also contends that the definition of emergency situation requires that an imminent danger of death or serious bodily harm be continuous for the emergency situation to exist, citing In the Matter of Alan Ray Shennum (Mont. 1984), 684 P.2d 1073, 41 St.Rep. 1148. In Shennum, Missoula officers briefly detained and disarmed a man who attended a Missoula City Council meeting with a loaded and cocked pistol. He was released without his weapon but arrested the next day when he went to the City Police headquarters to reclaim his gun. He was seen by a psychiatrist and moved to a hospital room where the door was kept open, leaving him free to wander about in an open area nearby. This Court held that there was no emergency on the day Shennum was arrested and detained, and the professional person made no finding that an emergency situation existed. These faults do not exist in this case. Mrs. Reiser was detained at the scene of her threatened suicide. She was seen by a psychiatrist within two hours who found she was seriously mentally ill and a threat to her own life. Involuntary commitment proceedings

were instituted at 8:00 a.m. that same morning. An emergency situation existed, although Dr. Prunty never stated so in so many words. There is no statutory requirement that in an emergency situation the imminent danger of death or injury continue beyond detention. In any event, Mrs. Reiser's behavior after detention, insofar as she was abusive toward Dr. Prunty and the nurses on admittance, suggests that she remained in a destructive mood once detained, if only for a portion of the day.

In sum, the requirements of § 53-21-129(2), MCA were substantially met. Dr. Prunty, a professional, concluded that Mrs. Reiser was seriously mentally ill and that an emergency situation existed. His conclusion permitted the lawful detention until the next regular business day. In this case, the next regular business day was November 5, as November 4 was a legal holiday. The District Court judge was advised of Mrs. Reiser's detention status on November 3, when he found probable cause for holding a commitment hearing. The hearing was held on November 5, and Mrs. Reiser was released to the care of friends at her initial appearance.

By 3:00 p.m. on November 3, Dr. Prunty had shared his findings with the assistant county attorney and stated that he felt an evaluation for commitment was in order and that he felt she was seriously mentally ill and a danger to herself.

Perhaps the only material shortcoming in following the statutory guidelines of § 53-21-129(2), MCA is Dr. Prunty's failure to file his findings with the District Court. However, there is no basis for liability on these grounds. The failure to file a report does not make Mrs. Reiser's detention unlawful, hence there are no grounds for reversal.

Mrs. Reiser next asserts that Dr. Prunty and the hospital violated duties owed to her to follow the prescribed statutory standards for mental health facilities set forth under §§ 53-21-146, -115 and -120, MCA.

Section 53-21-146 states:

> Right to be free from physical restraint and isolation. Patients have a right to be free from physical restraint and isolation. Except for emergency situations in which it is likely that patients could harm themselves or others and in which less restrictive means of restraint are not feasible, patients may be physically restrained or placed in isolation only on a professional person's written order which explains the rationale for such action.

This section provides a rather significant exception making it inapplicable to the detention of Mrs. Reiser. Section 53-21-146 is not intended to afford protections to people held under the emergency detention statutes. Rather it is intended to protect patients, people who are "committed by the court for treatment for any period of time. . ." Section 53-21-102(8), MCA. Mrs. Reiser was detained prior to a _court_ determination that she was seriously mentally ill, hence the statutory restrictions do not apply.

Mrs. Reiser next maintains that Dr. Prunty violated her rights under § 53-21-120. This section provides that a person detained under the emergency detention statute be detained in the least restrictive environment required to protect that person's life and physical safety. By its very nature this concept involves medical connotations outside the scope of knowledge of the layperson. What constitutes a "least restrictive environment" is a judgment that can only be made by an expert with the opportunity to consider all the facts of the case in light of what would be reasonable in similar circumstances. There is no evidence in the record to

suggest that Mrs. Reiser was placed in other than the least restrictive environment. Her own lay observations are insufficient to defeat the District Court's award of summary judgment to Dr. Prunty and the hospital.

Mrs. Reiser also argues that the hospital was negligent for failing to agree in writing to her detainment. This claim is based on § 53-21-120(2), MCA, which states in part: "No person may be detained in any hospital or other medical facility which is not a mental health facility unless such hospital or facility has agreed in writing to admit such persons." The parties agree that the hospital is not a mental health facility under the statutory definition. Mrs. Reiser, however, failed to provide evidence to support a prima facie case of negligence on this allegation. This provision of the statutes is not to create a basis of liability, but to aid in proof that the hospital did in fact admit the patient. Here the hospital does not deny admitting the patient, and the purpose of the statutory provision is not thereby thwarted. Liability in this case cannot be based on the provisions of § 53-21-120(2), MCA.

Mrs. Reiser next raises the argument that the District Court erred because it failed to find Dr. Prunty and the hospital in violation of §§ 53-21-114 and -115(10) because they did not inform her she had the right to refuse the sedative administered on November 4. A close examination of the record reveals that the medication referred to was in fact administered at Mrs. Reiser's request. The nurse's notes for November 4 at 1600 to 2300 hours (4:00 p.m. to 11:00 p.m.) state "rambling speech, requesting medication to slow thoughts down." Dr. Prunty ordered the sedative at 2200

hours (10:00 p.m.), apparently in response to Mrs. Reiser's request.

There is no evidence in the record that Mrs. Reiser objected to the medication. Further, the language of § 53-21-119, MCA provides that a person may waive her rights under the mental health code. It must be presumed from the evidence that when she requested a sedative, or at least did not refuse one, she waived her right to refuse the medication administered. Further, Mrs. Reiser offers no evidence that failure to notify her of her right to refuse the medication resulted in any actionable injury to her.

Finally, Mrs. Reiser contends that the hospital and Dr. Prunty had a responsibility, under the terms of § 53-21-115, to protect her constitutional right to vote. This right, she maintains, was unconstitutionally denied because of her unlawful detention. We find that this argument has no merit in light of our finding that her detention was lawfully justified under the emergency detention statutes.

In its opinion granting summary judgment to the hospital and Dr. Prunty and denying Mrs. Reiser's motion, the District Court wrote "while we must be ever vigilant of the rights and protections afforded to the seriously mentally ill, we must also guard against turning the mental health laws into a trap for the well intentioned persons who are doing their best to help the afflicted in an emergency situation. Perhaps Ruth Reiser is alive today because of the quick actions of the deputy sheriff, her daughter, Drs. Bahnson, Hathaway and Prunty, the hospital staff, and deputy county attorney Throssell. There is no basis, under the facts of this case, to turn the statutes against them." We agree with the logic

of the District Court's conclusion.   Therefore, we affirm the
District Court's actions.

_____
                        Justice

We Concur:

_____
          Chief Justice

_____

_____

_____

_____
          Justices