No. 92-061

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

ALLEN BUHR, Personal Representative of the
Estate of JOSHUA LLOYD, and on behalf of
the heirs, TOM LLOYD, and MICHELE LLOYD,

        Plaintiffs and Appellants,

  vs.

FLATHEAD COUNTY, a political subdivision of
the State of Montana; WALLACE S. WILDER, M.D.;
KALISPELL REGIONAL HOSPITAL; WESTERN MONTANA
REGIONAL MENTAL HEALTH CENTER,

        Defendants and Respondents.



FILED

DEC 8 1994

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Eleventh Judicial District,
                In and for the County of Flathead,
                The Honorable Leif B. Erickson, Judge presiding.

COUNSEL OF RECORD:

    For Appellants:

        Edward P. Moriarity (argued); Spence, Moriarity & Schuster,
        Jackson, Wyoming

        James A. Manley; Manley Law Offices, Polson, Montana

        Thomas J. Beers; Connell & Beers, Missoula, Montana

        Mary C. Downey; Vuong, Downey & Louie, Coronado, California

    For Respondents:

        Dolphy O. Pohlman (argued); Corette, Pohlman, Allen,
        Black & Carlson, Butte, Montana (for Mental Health Center)

        Larry E. Riley (argued); Garlington, Lohn & Robinson,
        Missoula, Montana (For Wallace S. Wilder, M.D.)

        Todd A. Hammer (argued); Warden, Christiansen, Johnson &
        Berg, Kalispell, Montana (for Flathead County)

        James E. Vidal (argued); Murray & Kaufman, Kalispell, Montana
        (for Kalispell Regional Hospital)

        James A. Haynes, Attorney at Law, Hamilton, Montana

Submitted:  June 28, 1994
Decided:  December 8, 1994

Filed:

_____
Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Allen Buhr appeals from judgments in favor of all defendants and from an order of the Eleventh Judicial District Court, Flathead County, denying his motion for a new trial. We affirm.

Buhr presents the following issues:

1.   Did the District Court properly instruct the jury regarding negligence per se?

> a.   Did the District Court err in instructing the jury on the statutory duties of Flathead County and Mental Health by quoting statutory language?

> b.   Did the District Court err by failing to instruct on each element of Buhr's negligence per se claims?

> c.   Did the District Court fail to instruct the jury on the full theory of Buhr's negligence claims by refusing his instruction quoting § 53-21-146, MCA?

2.   Did the District Court err in granting defendants' motion for a directed verdict on Buhr's civil rights claims against Flathead County and Sheriff Rhodes?

> a.   Did the District Court err in applying the deliberate indifference standard to Buhr's civil rights claims?

> b.   Did the District Court err in directing a verdict on Buhr's civil rights claims against Flathead County and Rhodes for their denial of medical treatment under the deliberate indifference standard?

> c.   Did the District Court err in directing a verdict on Buhr's civil rights claims involving alleged use of excessive force against Joshua under the deliberate indifference standard?

> d.   Did the District Court err in granting

2

Rhodes immunity from Buhr's civil rights claims?

3. Was the jury's verdict that Flathead County, Wilder, and Mental Health were not negligent supported by substantial evidence and not the result of passion or prejudice?

a. With regard to Flathead County allegedly denying Harris access to the soft cell and Mental Health failing to enter the soft cell for purposes of evaluating Joshua, was the jury's verdict finding neither Flathead County nor Mental Health negligent supported by substantial credible evidence?

b. Was the jury's verdict finding Wilder not negligent supported by substantial credible evidence?

c. With regard to Buhr's negligence per se claim against Mental Health on the basis of an alleged violation of § 53-21-129(2), MCA, was the jury's finding that Mental Health was not negligent supported by substantial credible evidence?

4. Did the District Court err in denying Buhr's motion for a new trial based on surprise and improper judicial comments?

a. Did Sheriff Rhodes' trial testimony concerning Flathead County's policies and procedures contradict his deposition testimony to Buhr's detriment?

b. Did the District Court's allegedly improper and prejudicial remarks provide a sufficient basis for Buhr's motion for a new trial?

5. Did Wilder's attorney prejudice the jury by making improper remarks while questioning witnesses and during closing argument?

6. Did the cumulative effect of the asserted errors prejudice Buhr to the extent that he was unable to receive a fair trial?

Joshua Lloyd (Joshua) was the son of Michele Lloyd (Michele)

3

and Tom Lloyd. He had undergone two surgical procedures while living in Utah: the first, at age four, removed a brain tumor and the second, at age thirteen, removed scar tissue which had developed as a result of radiation and chemotherapy treatment. The second operation damaged Joshua's hypothalamus and resulted in severe short-term memory loss, elevated temperatures, abnormal appetite control and liquid intake, and an occasional rage reaction.

Michele moved to Kalispell, Montana, with Joshua and his sister Mary in September, 1987. Within a short time thereafter, Michele took Joshua to the Kalispell Regional Hospital (Kalispell Regional) emergency room on three occasions with high fevers. On the third visit, Joshua met Dr. Wallace S. Wilder (Wilder), a pediatrician who subsequently became Joshua's primary treating physician.

On referral from her daughter's school counselor, Michele also began seeing Sally Cameron-Russell (Russell), a counselor and therapist with Western Montana Regional Community Mental Health Center (Mental Health). She sought counseling for emotional issues arising from Joshua's condition and, on one occasion, to discuss the possibility of institutionalizing Joshua because of his violent outbursts.

The frequency of Joshua's violent outbursts was increasing by January, 1988. Joshua directed his rage at Michele and his sister, occasionally causing injuries to both of them. Wilder and Michele discussed a plan using the Kalispell police to control Joshua's

4

outbursts. They hoped that, when Joshua became violent, the appearance of the police would result in improvements in Joshua's behavior. If not, Michele would progress to having Joshua placed in the police car, taken to the police station and, if necessary, placed in juvenile detention.

On January 17, 1988, Joshua had a violent outburst. He broke a window in his bedroom around 5:00 a.m., and Michele punished him and put him back to bed. He awoke three hours later and began to beat down the door of his room with a baseball bat. When he refused to stop, Michele called the police. Three officers responded shortly thereafter and took Joshua to the Kalispell police station.

Juvenile detention personnel stated that Joshua could not be placed in juvenile detention and recommended consulting with mental health personnel. Russell, Mental Health's therapist on call, came to the station at 11:30 a.m. and evaluated Joshua for approximately one-half hour. Joshua was calm during Russell's initial evaluation. While Russell discussed placement options with Michele, however, Joshua again became violent, throwing objects and threatening the police. At that point, Russell informed Michele that Joshua could be held for a few days under the Montana Mental Health Act.

Following calls to the County Attorney, Sheriff Charles Rhodes (Rhodes), and District Judge Michael Keedy, Joshua was transferred at approximately 3:00 p.m. to the Flathead County Sheriff's Department by order of Judge Keedy, and remanded to the custody of

the Flathead County detention center under a mental health hold. Russell contacted her supervisor, Bill Harris (Harris), and discussed Joshua's condition and placement options. Harris concurred with Russell's evaluation that Joshua could not return home and that placement in the detention center's "soft cell" was appropriate.

Joshua remained in the soft cell overnight and was monitored by sheriff's department personnel. Observations were conducted every fifteen to thirty minutes both in person and via visual and audio monitor.

Harris went to the detention center at approximately 7:30 a.m. the next morning to observe Joshua and follow up on the previous day's evaluation for the mental health hold. Harris observed Joshua through a window and attempted to talk to him. He received only "huh" responses, which he believed indicated Joshua was sleeping and did not want to be disturbed. After determining that no medical emergency existed, Harris returned to Mental Health and discussed Joshua's condition with Russell. They agreed that Joshua should not remain in the soft cell, but should be transferred to Kalispell Regional. Russell contacted Wilder, who made arrangements to have Joshua placed in Kalispell Regional's security room, a sparsely furnished room with padded walls, and assigned one-on-one nursing care, on his transfer to the hospital.

Approximately two hours later, Joshua was transferred to Kalispell Regional and taken to the security room. He had a major motor seizure forty-five minutes later and died when resuscitation

6

efforts failed.

Allen Buhr (Buhr), personal representative of Joshua's estate, brought a personal injury action on behalf of Joshua's estate and wrongful death actions on behalf of Michele, Tom, and Mary Lloyd. The actions alleged negligence against Wilder, Kalispell Regional, Mental Health, and Flathead County and civil rights claims against Flathead County and Rhodes. The District Court directed a verdict on the civil rights claims during trial. Following trial, the jury returned a special verdict finding each of the defendants not negligent. The District Court denied Buhr's motion for a new trial and Buhr appeals. Additional facts are included in our discussion of the issues.

> 1.  Did the District Court properly instruct the jury regarding negligence _per se_?

Jury Instructions 26 through 32, as given, related to Buhr's claims of negligence _per se_ against Mental Health and Flathead County for their involvement in Joshua's evaluation, detention, and restraint. This series of instructions began with a broad definition of negligence _per se_. The next instruction quoted the statutorily-stated purpose of the Montana Mental Health Act; it was followed by two instructions setting out statutory definitions of various terms as contained in § 53-21-102, MCA.

The statutory duties of Mental Health and Flathead County were set forth in Instructions 30 and 31. Instruction 30, quoting § 53-21-129(1) and (2), MCA, read as follows:

INSTRUCTION NO. 30
The Montana Mental Health Act provides:

7

(1) When an emergency situation exists, a peace officer may take any person who appears to be seriously mentally ill and as a result of serious mental illness to be a danger to others or to himself into custody only for sufficient time to contact a professional person for emergency evaluation. If possible, a professional person should be called prior to taking the person into custody.

(2) If the professional person agrees that the person detained appears to be seriously mentally ill and that an emergency situation exists, then the person may be detained and treated until the next regular business day. At that time, the professional person shall release the detained person or file his findings with the county attorney who, if he determines probable cause to exist, shall file the petition provided for under the Act in the county of the respondent's residence. In either case, the professional person shall file a report with the court explaining his actions.

Instruction 31, quoting from § 53-21-120, MCA, read as follows:

INSTRUCTION NO. 31

The Montana Mental Health Act provides:

1. A person detained shall be detained in the least restrictive environment required to protect the life and physical safety of the person detained or members of the public; in this respect, prevention of significant injury to property may be considered;

2. Whenever possible, a person detained shall be detained in a mental health facility and in the county of residence.

3. A person may be detained in a jail or other correctional facility only if no mental health facility is available or if the available mental health facilities are inadequate to protect the person detained and the public. As soon as a mental health facility becomes available or the situation has changed sufficiently that an available mental health facility is adequate for the protection of the person detained and the public, then the detained person shall be transferred from the jail or correctional facility to the mental health facility.

Finally, Instruction 32 set out the privileges of full mental health certification, including the ability to concur in the emergency detention of a person believed to be seriously mentally ill and to authorize restraint and isolation. The instruction was derived from the language of §§ 20.14.509(b-e) and 20.14.511(c),

8

ARM.

    a.  Did the District Court err in instructing the jury on the statutory duties of Flathead County and Mental Health by quoting statutory language?

Relying on this Court's decision in Azure v. City of Billings (1979), 182 Mont. 234, 596 P.2d 460, Buhr contends that these instructions were erroneous because they contained irrelevant language and forced the jury to interpret the statutes and determine the appropriate standard of care contained therein. His reliance on Azure is misplaced.

The jury instruction at issue in Azure quoted a statute in its entirety, informed the jury that the court had determined that defendant was negligent as a matter of law, and directed the jury to determine whether defendant's negligence was the proximate cause of plaintiff's injuries. Appellant argued that the jury should not have been instructed via the verbatim statutory language because doing so allowed the jury to consider again the issue already determined by the district court; namely, whether defendant was negligent. Azure, 596 P.2d at 472-73. We clarified in Azure that where statutes may require an interpretation, the interpretation must be supplied by the court, not the jury; we also clarified counsel's obligation to frame appropriate instructions containing both the substance and the meaning of the statute. Azure, 596 P.2d at 473. While we did note that, in the ordinary case, the jury should not be instructed "in the precise words of the statute," we saw no reversible error. Azure, 596 P.2d at 473.

Here, several of the court's negligence per se instructions

9

quoted statutes verbatim. While we agree that instructing the jury on negligence per se via verbatim statutory quotes may not have been the preferable method, our review of the record reveals that the instructions proposed by Buhr as alternatives to those given also were direct statutory quotes from the Mental Health Act. As we noted in Azure, counsel for the parties are responsible for assisting the court to frame instructions which set forth the substance and meaning of the statutes. Given that Buhr's proposed instructions also quoted statutory material, we refuse to put the District Court in error for giving instructions framed in this manner. On the basis of the record before us, we conclude that the District Court did not err in instructing on statutory duties by quoting statutory language.

b. Did the District Court err by failing to instruct on each element of Buhr's negligence per se claim?

Buhr makes a passing assertion in his brief that the jury instructions failed to set out each element of his negligence per se claim. During oral argument, however, Buhr's counsel conceded that the given instructions contained all the elements of the negligence per se claim. He argued instead that the given instructions were lengthy and confusing to the jury. The general rule in Montana is that "[i]f the given instructions, when viewed in their entirety, state the correct law applicable to the case, there is no reversible error." Walden v. State (1991), 250 Mont. 132, 137, 818 P.2d 1190, 1193. Except as discussed below, Buhr does not contend that the instructions failed to state the law applicable to his case. Therefore, we conclude that the District

10

Court did not err in giving instructions which, although lengthy, instructed the jury on the correct law applicable to Buhr's negligence per se claims.

> c. Did the District Court fail to instruct the jury on the full theory of Buhr's negligence claims by refusing his instruction quoting § 53-21-146, MCA?

Buhr next asserts that the District Court erred by not instructing the jury on the full theory of his case. Part of Buhr's theory was that § 53-21-146, MCA, imposed a statutory duty on defendants Flathead County and Mental Health to keep Joshua free of physical restraint and isolation and, to that end, to monitor his physical and psychiatric condition and provide for his physical needs and comfort. On that basis, Buhr contends that he was entitled to have the District Court give his proposed instruction 27(C), which quoted § 53-21-146, MCA. We disagree.

It is true that it is reversible error for a district court to refuse to instruct the jury on an important part of a party's theory of the case. Whitehawk v. Clark (1989), 238 Mont. 14, 20, 776 P.2d 484, 487. The existence of a legal duty owed by one party to another, however, "is a question of law for the court." Nautilus Ins. v. First National Ins., Inc. (1992), 254 Mont. 296, 299, 837 P.2d 409, 411 (citation omitted). "When examining whether certain jury instructions were properly given or refused, we must consider the jury instructions in their entirety and in connection with other instructions given and the evidence introduced at trial." Story v. City of Bozeman (1993), 259 Mont. 207, 222, 856 P.2d 202, 211 (citation omitted). Thus, the question before us is

11

whether § 53-21-146, MCA, imposed a duty on Flathead County and Mental Health to keep a person detained under the emergency provisions of the Mental Health Act free from physical restraint and isolation.

Section 53-21-146, MCA, provides in pertinent part:

Patients have a right to be free from physical restraint and isolation. Except for emergency situations in which it is likely that patients could harm themselves or others and in which less restrictive means of restraint are not feasible, patients may be physically restrained or placed in isolation only on a professional person's written order which explains the rationale for such action. . . . Whenever a patient is subject to restraint or isolation, adequate care shall be taken to monitor his physical and psychiatric condition and to provide for his physical needs and comfort.

We previously have determined that the intent of § 53-21-146, MCA, is to protect patients, specifically defined as "people who are 'committed by the court for treatment for any period of time . . . .'" See Reiser v. Prunty (1986), 224 Mont. 1, 12-13, 727 P.2d 538, 546; citing § 53-21-102(8), MCA (1985). Here, Joshua was not committed to the detention center for treatment as a patient, thereby bringing § 53-21-146, MCA, into play. Rather, the evidence that Joshua was raging out of control and that Michele feared for her and her daughter's safety demonstrated that Joshua was placed in the detention center's soft cell pursuant to § 53-21-129, MCA, the emergency detention statute.

We also reject Buhr's contention that the detention center's soft cell qualifies as a mental health facility. The definition of "mental health facility" in § 53-21-102(7), MCA, specifically excludes correctional institutions or facilities and jails.

12

Pursuant to that definition, the detention center's facilities are not a mental health facility to which § 53-21-146, MCA, applies.

The evidence established that Joshua was detained in the soft cell under the emergency provisions of the Mental Health Act and no error is asserted in the District Court's instruction to the jury on the duties owed by Flathead County and Mental Health under those provisions. We conclude that the legal duties contained in § 53-21-146, MCA, were not applicable as a matter of law and, therefore, that the District Court did not err by refusing to instruct the jury on those duties.

> 2. Did the District Court err in granting defendants' motion for a directed verdict on Buhr's civil rights claims against Flathead County and Sheriff Rhodes?

Buhr's civil rights claims under 42 U.S.C. § 1983 asserted that Flathead County and Rhodes denied Joshua a broad range of constitutional rights. In essence, the civil rights claims alleged that Flathead County and Rhodes failed to provide Joshua with appropriate medical care during his detention and that excessive force was used against him.

At the close of Buhr's case-in-chief, Flathead County and Rhodes moved for a directed verdict on the civil rights claims. The District Court granted the motion. It concluded that Buhr established the existence of the detention center's policy for providing medical care, but failed to offer any evidence that either Flathead County or Rhodes was "deliberately indifferent" to Joshua's medical needs. The court also concluded that no evidence supported Buhr's excessive force claim under the deliberate

13

indifference standard.

a. Did the District Court err in applying the deliberate indifference standard to Buhr's civil rights claims?

Buhr first argues that the District Court erred in applying the deliberate indifference standard to his civil rights claims. Relying on Youngberg v. Romeo (1982), 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28, he argues that the professional judgment standard is the correct standard and the standard which the District Court should have applied to his civil rights claims.

The general rule in Montana is that this Court will not consider on appeal a theory which was not raised in the trial court. Sherrodd v. Morrison-Knudsen (1991), 249 Mont. 282, 285, 815 P.2d 1135, 1137. Our review of the record before us reveals that, in his brief in the District Court on the civil rights claims, Buhr affirmatively stated that he had "an obligation to prove deliberate indifference." Furthermore, Buhr's proposed jury instructions on the civil rights claims required proof of deliberate indifference rather than the professional judgment standard he now advocates. Apparently recognizing these difficulties with his contention that the District Court applied the wrong standard, Buhr argues that we should utilize the plain error doctrine to reverse the District Court's directed verdicts on his civil rights claims.

The plain error doctrine "allows this Court to review errors that were not objected to at trial, but result in substantial injustice to a party by denying that party a fair trial." Geiger v. Sherrodd (1993), 262 Mont. 505, 508, 866 P.2d 1106, 1108. The

14

doctrine is "used in exceptional cases and should not be relied upon by counsel." Commission Comments, Rule 103(d), M.R.Evid. Here, Buhr himself failed to present the District Court with what he now contends is the appropriate standard for adjudication of his civil rights claims. He also conceded during oral argument that upon discovering his alleged error during the trial court proceedings, he hinted at the "concept" that deliberate indifference was the wrong standard but failed to propose any alternative standard to the District Court.

We decline to apply the plain error doctrine under such circumstances or to address the merits of Buhr's argument, raised for the first time on appeal, that the professional judgment standard applies. In doing so, we emphasize that in reviewing the District Court's application of the deliberate indifference standard, we express no opinion vis-a-vis whether that standard or the professional judgment standard properly governs claims of the nature made in this case.

> b. Did the District Court err in directing a verdict on Buhr's civil rights claims against Flathead County and Rhodes for their denial of medical treatment under the deliberate indifference standard?

Buhr also argues that the District Court improperly applied the deliberate indifference standard. He contends that the evidence established that Flathead County and Rhodes were deliberately indifferent to Joshua's constitutional rights in terms of the medical treatment Joshua received; on that basis, he urges that the trial court erred in directing a verdict on his civil rights claims related to that medical treatment.

15

Buhr first addresses the District Court's grant of Flathead County's motion for a directed verdict on the civil rights claims regarding Joshua's medical treatment while detained in the soft cell. He argues that the detention center's "hands-off" policy toward mental health detainees, abbreviated booking procedures, and the fact that detention center personnel's only medical background consisted of first-aid training, prevented detention center personnel from adequately monitoring Joshua's medical needs and providing him the medical treatment he required.

Relying on the Supreme Court's decision in Youngberg, Buhr contends in this regard that Flathead County was required to ensure that decisions regarding Joshua's medical care were made by medical professionals exercising professional judgment. Under this standard, liability could be imposed for decisions regarding medical treatment "when the decision [regarding medical treatment] . . . is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Youngberg, 457 U.S. at 323.

Buhr argues that Flathead County's policies regarding medical treatment of detainees held under § 53-21-129, MCA, prevented qualified medical professionals from making determinations regarding Joshua's medical treatment and exhibited "deliberate indifference" to Joshua's medical needs. In large part, this argument is an attempt to weave the Youngberg "professional judgment" standard advocated above into the deliberate indifference

16

standard which is properly before us. We reject such an approach.

Buhr brought his civil rights claims pursuant to 42 U.S.C. § 1983, which states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Liability cannot be imposed on a local government entity for a constitutional tort pursuant to 42 U.S.C. § 1983 unless a plaintiff establishes:

> (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (4) that the policy is the "moving force behind the constitutional violation."

Oviatt By and Through Waugh v. Pearce (9th Cir. 1992), 954 F.2d 1470, 1474.

A district court "may grant a directed verdict only when it appears as a matter of law that the nonmoving party could not recover upon any view of the evidence, including the legitimate inferences to be drawn from the evidence." King v. Zimmerman (Mont. 1994), 878 P.2d 895, 899, 51 St.Rep. 659, 660-61 (citation omitted). "A motion for a directed verdict should only be granted when there is a complete absence of any evidence to warrant submission [of the case] to the jury and all factual inferences must be viewed in the light most favorable to the nonmoving party." Moralli v. Lake County (1992), 255 Mont. 23, 27, 839 P.2d 1287,

17

1289.  We review a district court's decision regarding a motion for a directed verdict to determine if the court abused its discretion.  See Nelson v. Flathead Valley Transit (1992), 251 Mont. 269, 274, 824 P.2d 263, 267.

Buhr was required to offer evidence on each of the four elements necessary to impose liability pursuant to 42 U.S.C. § 1983, in order to withstand a motion for a directed verdict.  We focus on the second and third elements.

Under Pearce, the second element of Buhr's § 1983 action against Flathead County is the existence of a county policy regarding medical treatment for individuals detained in the detention center.  Buhr introduced evidence regarding the detention center's medical policies for mental health detainees.  His evidence confirmed that the detention center admitted mental health detainees such as Joshua under an abbreviated booking procedure which did not mandate questions related to medications and that asking questions about medications was within the discretion of detention center personnel, who dispensed medications only when necessary for the physical health of the detainee.  After a detainee was admitted, the detention center followed a "hands-off" policy whereby no one would enter the soft cell.  Regarding medical treatment, Buhr's evidence confirmed that detention center personnel, who were trained in first-aid, were authorized to arrange either visits with doctors to provide medical treatment for detainees or, in instances where they determined a medical problem was more serious, transportation of the detainee to the hospital.

18

The record, therefore, is clear that Buhr offered evidence on the second element.

Buhr's evidence regarding existence of a policy, however, is insufficient to trigger liability for Flathead County and Rhodes under 42 U.S.C. § 1983, or to withstand a motion for a directed verdict. See Pearce, 954 F.2d at 1477. A plaintiff such as Buhr must also offer evidence on the third element and that evidence, or legitimate inferences therefrom, must be sufficient to allow him to recover on the claim that the county's policy exhibited a deliberate indifference to Joshua's constitutional rights. Pearce, 954 F.2d at 1477. "This occurs when the need for more or different action 'is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'" Pearce, 954 F.2d at 1477-78; citing City of Canton v. Harris (1989), 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412, 427.

City of Canton involved a claimant, Harris, who was brought to a police station in an incoherent state and, after being taken inside, slumped to the floor where the police allowed her to remain without any medical attention. One hour later, Harris was released and taken to a hospital via an ambulance provided by her family. She was diagnosed with severe emotional ailments and hospitalized. City of Canton, 489 U.S. at 381. Harris subsequently brought an action pursuant to 42 U.S.C. § 1983, claiming the city was liable for violation of her right to receive necessary medical attention

19

while in police custody.

Harris claimed that Canton provided police shift commanders sole discretion, without any special training beyond first-aid, to determine when to "summon medical care for an injured detainee." City of Canton, 489 U.S. at 381-82. Her case went to the jury under a reckless, intentional or with gross negligence standard and the jury found in her favor. On appeal, the Sixth Circuit Court of Appeals affirmed the imposition of municipal liability under § 1983 where a plaintiff proves that a municipality, acting recklessly, intentionally or with gross negligence, failed to train its police force, and where that failure resulted in a deprivation of constitutional rights that was substantially likely to result. City of Canton, 489 U.S. at 385.

The United States Supreme Court rejected the Circuit Court's "overly broad rule" for imposing a municipal liability under § 1983 and adopted the "deliberate indifference" standard. City of Canton, 489 U.S. at 388. It determined that "only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." City of Canton, 489 U.S. at 389. The focus of the inquiry "must be on the adequacy of the training program in relation to the tasks the particular officers must perform." City of Canton, 489 U.S. at 390. The Court then stated:

> [n]either will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to

20

enable officers to respond properly to the usual and recurring situations with which they must deal.

City of Canton, 489 U.S. at 391 (emphasis added).

Following the City of Canton, the Ninth Circuit Court of Appeals addressed the question of when a policy exhibits deliberate indifference in Pearce. In Pearce, an arrestee who remained incarcerated for 114 days before being arraigned, sued the county and the sheriff alleging violations under § 1983. Pearce, 954 F.2d at 1472. The arrestee's name was dropped from the booking sheet through an error by the court clerk who prepared the docket sheet. Pearce, 954 F.2d at 1473. While the sheriff was aware that inmates were not arraigned because of mistakes similar to this, the sheriff's department failed to develop internal procedures to guard against mistakes and chose to rely on the inmates, their attorneys, or family members. Pearce, 954 F.2d at 1473. The evidence demonstrated, however, that some inmates were unable to communicate with their lawyers or family members and that the sheriff knew of nineteen incidents where inmates missed arraignments due to mistakes by jail and court personnel. Pearce, 954 F.2d at 1478.

The federal district court refused defendant county's and sheriff's motion for judgment notwithstanding the verdict and defendants appealed. The Ninth Circuit determined that it was reasonably certain, given the lack of procedures to relieve the known problem, that inmates would be erroneously deprived of their liberty and that the need for different procedures was so obvious that the sheriff's refusal to institute procedures to guard against known and repeated mistakes amounted to deliberate indifference.

21

Pearce, 954 F.2d at 1478.

Here, the District Court concluded that Buhr's evidence regarding Flathead County's medical policies was insufficient to go to the jury under the deliberate indifference standard. Buhr's evidence established that Joshua was visually monitored every five to fifteen minutes and physically observed every fifteen to thirty minutes while he was detained in the soft cell. He further established that the detention personnel, had they detected a medical emergency, would not have hesitated to summon medical help for Joshua.

Unlike the situation in Pearce, Buhr's evidence did not establish--or tend to establish by inference--any awareness by Rhodes or detention center personnel that existing medical policies regarding mental health detainees were causing or likely to cause denial of adequate medical treatment to such detainees. Indeed, Harris testified during Buhr's case in chief that the "hands-off" policy is the preferred approach in dealing with violently mentally ill detainees placed in a soft cell. In his view, having people enter the soft cell might further the detainee's agitation or combativeness and the preferred treatment is to try not to do so. Furthermore, there is a complete absence of evidence under the City of Canton guidelines demonstrating that the detention center's need for different medical procedures was so obvious, and the procedures so deficient when compared to the usual medical situation confronting detention personnel, that Flathead County and Rhodes were deliberately indifferent to that need.

22

Buhr's failure to offer evidence which would be sufficient to allow him to recover under the deliberate indifference standard defeats his § 1983 claim regarding inadequate medical treatment. Thus, the District Court did not abuse its discretion in directing a verdict on the civil rights claims relating to lack of medical treatment for Joshua under that standard.

> c. Did the District Court err in directing a verdict on Buhr's civil rights claims involving alleged use of excessive force against Joshua under the deliberate indifference standard?

Buhr also asserts error in the District Court's directed verdict on his civil rights claim against Flathead County based on an alleged use of excessive force against Joshua by Officer Mike Cooper (Cooper). This claim was premised on nurses noticing, when Joshua was admitted to the hospital on January 18, that he had several areas of bruising and possibly a dislocated shoulder. Joshua did not display any noticeable bruises when he was brought to the detention center. Buhr attributed the bruises and possible shoulder dislocation to the treatment Joshua received from Cooper when Cooper placed Joshua in the soft cell.

Here, as above, Buhr was required to introduce evidence on each of the four elements required to establish a local government entity's liability pursuant to § 1983, including that the county had a policy and that the policy amounted to deliberate indifference. Pearce, 954 F.2d at 1474. Buhr established the existence of the detention center's policy regarding use of excessive force. That policy required an officer who employed excessive force to file an incident report setting forth the

23

circumstances surrounding the use of force by the conclusion of the officer's next shift.

Buhr also introduced evidence that the policy did not define the term "excessive force." Instead, the policy left both the definition of the term and the determination of whether excessive force requiring submission of an incident report has been used to the discretion of detention center personnel. Thus, Buhr presented sufficient evidence on the existence of a policy to meet the second element for imposing liability under § 1983.

According to Buhr, it was this policy which led to the alleged use of excessive force resulting in injury to Joshua. Buhr asserts that leaving decisions on whether excessive force was used and whether an incident needed to be reported to the discretion of detention center personnel led to a deprivation of Joshua's right to be free from such force. The District Court directed a verdict in favor of Flathead County and Rhodes regarding this claim determining that, pursuant to the United States Supreme Court's decision in Oklahoma City v. Tuttle (1985), 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791, one alleged instance of excessive force, even if proved, was insufficient to support a claim under 42 U.S.C. § 1983.

Buhr was required to introduce evidence that the policy implemented by Flathead County and Rhodes demonstrated deliberate indifference to Joshua's constitutional rights. Pearce, 754 P.2d at 1474. Buhr, however, failed to introduce any evidence on this element. Buhr's evidence focused on such things as Cooper's

24

nickname, "Gestapo Mike;" his performance evaluations noting that he adhered strictly to rules and suggesting that he take a more diplomatic approach with inmates; and a psychological profile of Cooper stating that, while he was characteristically gentle and non-violent, he was aggressive at deeper levels and expressed anger in indirect ways.

In Tuttle, the Supreme Court stated that where the policy relied on is not unconstitutional, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." Tuttle, 471 U.S. at 824. In this case, there was no allegation or argument that Flathead County's policy regarding use of excessive force was, in and of itself, unconstitutional. Furthermore, while Buhr has cited relevant portions of the trial record to support his assertions regarding Cooper's disciplinary style, our review establishes that Buhr failed to produce any evidence relating to more than the single incident alleged here to support his claim under 42 U.S.C. § 1983.

Buhr failed to offer any evidence establishing that Flathead County and Rhodes were deliberately indifferent to Joshua's constitutional rights through the detention center's policies with regard to use of excessive force. We conclude, therefore, that the District Court did not err by directing a verdict on Buhr's civil rights claims against Flathead County and Rhodes based on alleged use of excessive force by Cooper.

25

d. Did the District Court err in granting Rhodes immunity from Buhr's civil rights claims?

Buhr also asserts that the District Court erred in granting Rhodes immunity against Buhr's civil rights claims. Because we have concluded above that the District Court properly granted Flathead County's and Rhodes' motion for a directed verdict on the civil rights claims, we need not address the separate issue of Rhodes' immunity from those claims.

3. Was the jury's verdict that Flathead County, Wilder, and Mental Health were not negligent supported by substantial evidence and not the result of passion or prejudice?

Buhr raises three issues regarding the jury's verdicts in favor of the defendants on his negligence claims. He contends that, regardless of the jury's interpretation of the evidence, the verdicts were contrary to the evidence and obviously the result of prejudice or passion. His argument regarding passion or prejudice which may have influenced the jury's verdict focuses on comments made by Wilder's counsel; we address those comments below in issue 5.

Our role in reviewing a jury's verdict is limited. Weber v. State (1992), 253 Mont. 148, 156, 831 P.2d 1359, 1364. We review the evidence in a light most favorable to the prevailing party and determine whether the jury's verdict is supported by substantial evidence. Weber, 831 P.2d at 1364. This Court will not retry a case because the jury believed one party's evidence over another's; it is within the jury's province to adopt testimony presented on

26

behalf of one party to the exclusion of testimony presented by the other party. Silvis v. Hobbs (1992), 251 Mont. 407, 412, 824 P.2d 1013, 1016.

> a. With regard to Flathead County allegedly denying Harris access to the soft cell and Mental Health failing to enter the soft cell for purposes of evaluating Joshua, was the jury's verdict finding neither Flathead County nor Mental Health negligent supported by substantial credible evidence?

Harris arrived at the detention center at 7:30 a.m. on January 18, to further evaluate Joshua. He looked through the observation window in the door of the soft cell but did not enter the cell to conduct a closer evaluation. Harris testified he did not enter the soft cell because he was given an official order by Deputy Theodore Stollfuss (Stollfuss) denying him entry into the cell. Harris' testimony regarding the reason he did not enter the soft cell differed with Stollfuss' testimony that he informed Harris that Joshua could be unpredictably violent but had not denied Harris access to the soft cell.

Buhr contends, that at the time Harris and Stollfuss made their observations, Joshua was exhibiting symptoms indicative of a serious medical crisis. He argues that after observing these symptoms, it was unreasonable for Harris and Stollfuss to conclude that a medical emergency did not exist. On that basis, he asserts that Harris should have entered the soft cell to conduct a closer evaluation and that either Mental Health was negligent for his failure to do so or Flathead County was negligent in denying him access to the soft cell.

Buhr's expert, Doctor George Schwartz (Schwartz), testified

27

that Joshua's physical condition, which Harris and Stollfuss observed the morning of January 18, was the result of events which began the night before. He testified that, because Joshua did not receive appropriate amounts of liquid during the night, he dehydrated and contracted hyperthermia. Schwartz stated that Joshua was rendered immobile and unable to speak except for grunting, and that he later experienced metabolic crisis. In Schwartz's opinion, anyone observing Joshua lying in a pool of bodily fluids, unable to speak and not moving, would conclude there was a serious medical emergency.

Stollfuss and Harris provided testimony significantly different from that of Schwartz as to whether Joshua experienced a medical emergency that morning. Stollfuss testified that, when Harris arrived, Joshua appeared to be sleeping and nothing he observed led him to conclude Joshua was experiencing a medical emergency. Had Stollfuss detected such an emergency, he testified that he would not have hesitated to summon medical assistance. Harris also testified that Joshua's actions were consistent with someone sleeping, that he did not perceive a medical emergency and that he would have contacted medical personnel had he concluded a medical emergency existed. While both Harris and Stollfuss testified that excrement was present in the soft cell, neither concurred with Schwartz's description that Joshua was lying in a pool of bodily fluids.

Stollfuss also provided additional information about Joshua's condition during that morning. He testified that at 6:00 a.m.,

28

Joshua was standing in the soft cell and calling out for his mother. Again, at approximately 9:30 a.m., Joshua was standing in the soft cell, staring toward the ceiling and calling for his mother to let him out.

In essence, Buhr first suggests that the jury should not have believed Harris' and Stollfuss' testimony that Joshua was not experiencing a medical emergency. As discussed above, it is within the province of the jury to adopt the testimony of one party to the exclusion of the other's. The jury apparently adopted Flathead County's and Mental Health's testimony regarding the absence of a medical emergency.

Buhr next argues that, regardless of whether Harris or Stollfuss detected a medical emergency, Harris would have determined that a medical emergency existed and summoned medical assistance had he entered the soft cell and conducted a thorough evaluation of Joshua's condition. Based on Harris' and Stollfuss' allegedly conflicting testimony regarding why Harris did not enter the soft cell, Buhr contends that either Flathead County was negligent in refusing Harris admission or Mental Health was negligent as a result of Harris' failure to enter, but the jury's verdict finding neither negligent is not supported by the evidence. We disagree.

Stollfuss testified he had arrived at work early that morning and was briefed about Joshua's condition. He was told that Joshua "had been pacing most of the night, been awake; that he was irritable and could be belligerent; and handle the situation

29

carefully;" Stollfuss relayed this information to Harris when Harris arrived for the evaluation. Stollfuss then advised Harris that he was concerned about opening the door and upsetting Joshua again because Joshua had been agitated earlier in the morning.

Stollfuss also testified that Harris remained at the soft cell for approximately fifteen minutes. He stated that, normally, mental health professionals had full access to mental health detainees and that he did not deny Harris entry into the soft cell. On cross-examination, Stollfuss admitted it was possible that Harris misunderstood him to mean that Harris could not enter the soft cell.

It was within the jury's province to believe Stollfuss' testimony that he did not deny Harris access to the soft cell. We conclude, therefore, that substantial evidence supports the jury's finding that Flathead County was not negligent in denying Harris access to evaluate Joshua.

Harris' testimony established that he did not go into the cell. He testified that when he asked if he could enter the cell, Stollfuss indicated that Joshua was violent and that Stollfuss did not believe it would be safe to allow anyone to enter; Harris interpreted Stollfuss' reply as an official denial of his request for access.

Regarding his ability to evaluate Joshua's physical condition, Harris testified that he was able to observe Joshua through a window in the door of the soft cell. Joshua was lying at a forty-five degree angle to, and approximately three feet away from, the

30

door; facing away from the window. Harris observed breathing motions and asked Joshua questions, but received no intelligible response. He added that he could have obtained access to the soft cell by requesting additional officers or contacting the Sheriff had he observed anything leading him to conclude that a medical emergency existed, but that he observed no such indications of an emergency. Harris' testimony constitutes substantial credible evidence supporting the jury's verdict that Mental Health was not negligent in failing to enter the soft cell for purposes of evaluating Joshua.

The jury was free to adopt Stollfuss' and Harris' account of the events which took place the morning of January 18 regarding the lack of a medical emergency and their respective testimonies relating to Harris' failure to enter the soft cell. We conclude that substantial credible evidence supports the jury's verdict.

b. Was the jury's verdict finding Wilder not negligent supported by substantial credible evidence?

Buhr's claim of professional negligence against Wilder contained two components: Wilder's recommendation that the Kalispell police be used to control Joshua's behavior and his alleged failure--after talking to Russell and agreeing to arrange Joshua's admission to the hospital--to follow up and ensure that Joshua was transferred from the detention center to the hospital. The jury rejected these claims by finding Wilder not negligent.

Buhr argues that, although the testimony relating to the use of the police and Joshua's transfer conflicts, the jury was compelled to find Wilder negligent. The standard, however, is

31

whether, when viewed in a light favorable to Wilder, substantial evidence supports the jury's verdict. Weber, 831 P.2d at 1364. We also reiterate that it is within the jury's province to adopt one party's evidence over that of the other. Silvis, 824 P.2d at 1016.

With regard to the use of the police, Wilder testified that he believed Joshua's behavior was controllable to some extent. He had talked to Michele and a home health nurse assisting her about the possibility of involving the Kalispell police when Joshua's rages became uncontrollable. Wilder's suggested approach was that, if the police arrived and Joshua's behavior improved, the behavior-control process need go no further. If the behavior did not improve, then the police would progress to placing Joshua in a squad car, taking him to the jail and, as a last alternative, placing Joshua in juvenile detention. In Wilder's opinion, this was the only way, short of institutionalization, to deal with Joshua's violent behavior.

Dr. Marion Walker, Joshua's former pediatrician in Salt Lake City, Utah, testified that the process Wilder recommended involving the police was reasonable and that he would not fault Wilder for advising that type of action. Walker testified that recommending this approach did not constitute professional negligence.

Regarding Wilder's recommended behavior modification approach, the jury's finding that Wilder was not negligent was supported by substantial credible evidence. Although Wilder's testimony and that introduced on his behalf conflicted with testimony of other witnesses, it was the jury's decision which evidence to accept.

32

Buhr's claim that Wilder was negligent for failing to follow through and ensure that Joshua actually was transferred to the hospital rests on Buhr's view that Wilder undertook to do so during the course of his telephone conversation with Russell. Buhr alleged that had Wilder made the appropriate arrangements when he was informed Joshua was in the detention center, Joshua would have been transferred earlier and his life might have been saved.

Wilder testified that after Michele's phone call at 10:00 a.m. on January 17, he did not receive another telephone call regarding Joshua until approximately 9:30 a.m. the next day, when Russell informed him that Joshua was in the detention center's soft cell on a mental health hold. Both Wilder and Russell testified that Russell asked for permission to have either Mental Health or Flathead County move Joshua to the hospital and whether Wilder would admit him. Wilder recalled asking Russell about Joshua's level of functioning and that Russell's response did not indicate the existence of any medical emergency. Russell did relay Harris' observations of Joshua to Wilder, who agreed that Joshua should come to the hospital and that he would arrange for admission.

The next telephone call Wilder received concerning Joshua came from the County Attorney's office at approximately 12:00 p.m., asking if Joshua could be transferred. Wilder testified that he had assumed the transfer had already taken place and, therefore, nodded to his receptionist who conveyed the answer that Joshua could be transferred. When asked if he had called anyone to advise that the arrangements for Joshua's admission had been made, Wilder

33

responded that he had undertaken simply to call the hospital and make arrangements for Joshua's admission on arrival there. The record contains substantial evidence supporting the jury's verdict on this component of Buhr's negligence claim against Wilder.

We reiterate that it is within the jury's province to resolve conflicting testimony and that our review of jury verdicts is limited to ascertaining whether they are supported by substantial credible evidence. Weber, 831 P.2d at 1364. Regarding Wilder's recommendation that Michele control Joshua's behavior by using the Kalispell police and his acts relating to Joshua's admission to the hospital on January 18, we conclude that substantial credible evidence supports the jury's determination that Wilder was not negligent.

> c. With regard to Buhr's negligence per se claim against Mental Health on the basis of an alleged violation of § 53-21-129(2), MCA, was the jury's finding that Mental Health was not negligent supported by substantial credible evidence?

As a final issue regarding the jury's verdict, Buhr argues that, with regard to the emergency evaluation of Joshua on January 17, the finding that Mental Health was not negligent was entirely contrary to the evidence. This argument is based on Mental Health's acknowledgement that Russell was not a "professional person" as defined in § 53-21-102(12)(b), MCA. Buhr contends that Mental Health's procedure of having Russell evaluate Joshua and then report to Harris violated the requirements of § 53-21-129(2), MCA, and, as a result, constituted negligence per se by Mental Health.

34

The District Court instructed the jury that if it found that Mental Health violated § 53-21-129, MCA, Mental Health would be negligent and the jury should then proceed to determine the causation question. The instruction was in accord with our cases on statutory violations. See, e.g., VanLuchene v. State (1990), 244 Mont. 397, 797 P.2d 932. In order to establish negligence per se, a plaintiff must first prove that the defendant neglected or violated a duty imposed on it by statute. See Gunnels v. Hoyt (1981), 194 Mont. 265, 271, 633 P.2d 1187, 1192.

Here, Buhr's negligence per se claim against Mental Health was premised on an alleged violation of § 53-21-129, MCA. Section 53-21-129(2), MCA, provides that "[i]f a professional person agrees that the person detained appears to be seriously mentally ill and that an emergency situation exists, then the person may be detained and treated until the next regular business day." It is undisputed that § 53-21-129(2), MCA, applies to Mental Health's evaluation of Joshua. The issue is whether Mental Health violated that statute in conducting Joshua's evaluation.

Russell testified that she first evaluated Joshua at approximately 11:30 a.m. on January 17, when she arrived at the Flathead County detention center; she found him calm and able to communicate. Russell then talked to Michele.

During her conversation with Michele, Russell was called back to the area in the detention center where Joshua was held. At that time, Joshua had become very combative, throwing objects around the waiting area and threatening the police officers with his fists.

35

When Joshua reached for a telephone book, an officer restrained him and placed him on the floor. This episode lasted approximately fifteen minutes.

Russell discussed the placement options with Michele and told her that Joshua could be placed in the soft cell. Michele concurred with the placement and the arrangements to have Joshua detained were made.

Russell then contacted her supervisor, Harris, who is a professional person under the Mental Health Act and who was responsible for assisting Russell in the evaluation of any mental health holds for that weekend. Harris testified that he discussed Russell's evaluation of Joshua in detail with Russell at approximately 4:00 p.m. on January 17, and agreed with Russell's evaluation that Joshua appeared to be seriously mentally ill and that an emergency situation existed; he concurred in the determination that placement in the soft cell was appropriate. He further testified that he and Russell had fully discussed the requirements of a mental health hold and that any further observation by himself would have been redundant. He elected not to make an in-person evaluation of Joshua himself because he trusted Russell's observations. He undertook to evaluate Joshua again the next morning.

Dr. Jay Palmatier, then a clinical psychologist for defendant Mental Health and regional clinical director for the western Montana region, testified on Mental Health's behalf. He testified that he was a certified professional person under the Mental Health

36

Act and had considerable experience in conducting emergency mental health holds under the Act. He was aware that Russell was not a certified professional and Harris was. It was his opinion that the procedure followed by Russell and Harris in evaluating Joshua was a reasonable and appropriate means of complying with the duty and standard of care set forth in the statute. Buhr presented conflicting evidence to the effect that Mental Health's procedure violated § 53-21-129, MCA.

It is clear that conflicting evidence was presented on whether the cooperative evaluation procedure violated the statute. The issue was submitted to the jury for its determination under an appropriate instruction to which no objection was made; indeed, Buhr's proposed instruction on the negligence per se claim against Mental Health submitted the issue of a statutory violation to the jury as a factual question. The jury, free to accept or reject conflicting testimony, determined that Mental Health did not violate the statute and was not negligent. We conclude that the jury's finding is supported by substantial credible evidence.

4. Did the District Court err in denying Buhr's motion for a new trial based on surprise and improper judicial comments?

Buhr filed an amended motion for a new trial on a variety of grounds, including unfair surprise with respect to Rhodes' testimony and improper comments by the court. The District Court denied the motion by order dated September 24, 1991. We review a district court's denial of a motion for a new trial for abuse of discretion. See Brockie v. OMO Construction (1992), 255 Mont. 495,

37

498, 844 P.2d 61, 63.

    a.    Did Sheriff Rhodes' trial testimony concerning
    Flathead County's policies and procedures contradict his
    deposition testimony to Buhr's detriment?

Buhr submitted interrogatories to Flathead County requesting, among other things, information about its policies and procedures pertaining to "Health Intake Screening and Administration of Medicine" at the time Joshua was detained in the soft cell. In response, the County referenced a policy manual written after the events at issue, but containing the policies routinely used by Sheriff's Department personnel at the time those events occurred. Rhodes referred to the same manual during his later deposition. Among other things, Rhodes stated that the manual was the result of successive drafts.

At trial, Buhr examined Rhodes about the health screening and medication policies. Rhodes responded by stating that, at the time Joshua was detained, his department did not have any written policies. He further responded that the manual used in his deposition contained current policies and that the earlier interrogatory answer identifying the manual as containing the policies in effect when Joshua was detained was not quite accurate. Buhr moved for admission of the written policies and procedures. Rhodes' counsel objected on the basis of relevancy and lack of foundation and the District Court sustained the objection. Buhr continued his examination of Rhodes.

On appeal, Buhr argues that the change in Rhodes' testimony relating to medical policies prejudiced his case and entitles him

38

to a new trial on his claims against Flathead County. We disagree.

Section 25-11-102(3), MCA, provides that a new trial may be granted on the application of a party aggrieved by "accident or surprise which ordinary prudence could not have guarded against." We previously have determined that a party moving for a new trial under this subsection must show that:

> 1) the moving party was actually surprised; 2) the facts causing the surprise had a material bearing on the case; 3) the verdict or decision resulted mainly from these facts; 4) the surprise did not result from the moving party's inattention or negligence; 5) the moving party acted promptly and claimed relief at the earliest opportunity; 6) the moving party used every means reasonably available at the time of the surprise to remedy it; and 7) the result of a new trial without the surprise would probably be different.

Donovan v. Graff (1988), 231 Mont. 456, 459, 753 P.2d 878, 880. Each of these criteria must be met before a party is entitled to a new trial on the basis of surprise. Boyd v. State Medical Oxygen & Supply, Inc. (1990), 246 Mont. 247, 254, 805 P.2d 1282, 1287.

It is apparent from the interrogatory answers and Rhodes' deposition and trial testimony that the fact which surprised Buhr was that the detention center's written manual did not contain the identical medical policies used at the time Joshua was detained. Buhr offers no argument regarding how this fact had a material bearing on his case. Indeed, after reviewing Buhr's thorough questioning of Rhodes about the intake procedures and administration of medications in the detention center when Joshua was detained, we cannot conclude that this "surprise" had a material bearing on Buhr's case, that the verdict in favor of Flathead County resulted from it, or that the result of a new trial

39

would have been different.

Our review of the record also reveals that Buhr did not satisfy the fifth criterion. At the point when the alleged surprise occurred, Buhr neither objected to Rhodes' testimony nor claimed that the change in Rhodes' testimony detrimentally impacted his ability to present his case. It was only after the jury returned a verdict adverse to Buhr that he claimed surprise based on the change in Rhodes' testimony. We conclude, therefore, that Buhr failed to act promptly and claim relief from the surprise at the earliest opportunity.

Furthermore, we agree with Rhodes that Buhr could have taken steps to remedy any effect of the alleged surprise, including a motion for a continuance or a request for a court order making a transcript of Rhodes' testimony available for Buhr's witnesses. The record does not establish any effort by Buhr to remedy the surprise; thus, the sixth criterion was not satisfied.

Buhr clearly did not meet the criteria required for entitlement to a new trial under § 25-11-102(3), MCA. We conclude, therefore, that the District Court did not err in denying Buhr's motion for a new trial based on surprise.

b. Did the District Court's allegedly improper and prejudicial remarks provide a sufficient basis for Buhr's motion for a new trial?

Buhr asserts that the District Court erred by making several comments on the length of the trial to the jury and, on one occasion, by questioning Wilder in a manner favorable to Wilder's defense. The primary assertion of error relates to a comment by

40

the court after counsel for Kalispell Regional thanked the jury for its attention "during this lost summer of 1991." The judge stated as follows:

> Somebody noted the wasted summer of '91. I hope it hasn't been entirely wasted for you. I hope you find it an interesting and challenge [sic] task. As you are citizens of this state and nation, I think you recognize the importance of what you're doing, and there's still, after all, a good part of August left.

Buhr also refers to eight instances over the course of trial where the judge made comments such as "I'll remind you once again, we'll reconvene Monday . . . and we'll try and get this case tried" and "I've been at this way too long, this trial." Regarding the District Court's questioning of Wilder, the judge simply asked if Michele had provided information that Joshua was allergic to Valium and if Wilder knew whether or not Joshua was allergic to Valium.

We have examined the record regarding each of the statements Buhr asserts to be improper and prejudicial. With the single exception of the "wasted summer comment," Buhr did not object to the court's comments or questions. "Failure to object to alleged error at trial precludes an appellant from raising that issue on appeal." Barrett v. ASARCO, Inc. (1990), 245 Mont. 196, 205, 799 P.2d 1078, 1083 (citation omitted). Therefore, we decline to address Buhr's assertions of error involving these comments and questions.

Regarding the "wasted summer" comment, Buhr contends that it implied that the jury had wasted its time with this case and suggested that the jury was expected to return a defense verdict, thereby violating his right to a fair trial. We disagree.

41

We previously have cautioned that trial judges must take care to ensure that they do not abandon their role as impartial judges in favor of that of advocates. State v. Stafford (1984), 208 Mont. 324, 331, 678 P.2d 644, 648. Here, the District Court's comment contains no implication that the court was directing a defense verdict or in any way abandoning its proper role. Indeed, this comment was a salutary one which merely urged the jury to recognize the importance of its role and its decision. We conclude, therefore, that the District Court did not abuse its discretion by denying Buhr's motion for a new trial on the basis of this comment.

5. Did Wilder's attorney prejudice the jury by making improper remarks while questioning witnesses and during closing argument?

Buhr offers numerous examples of allegedly prejudicial comments by Wilder's counsel. Many of the examples involve counsel's introducing questions with comments such as "I am sure after three days of deposition and all this questioning, you are probably getting tired of lawyers questioning you" and "Doctor, you can characterize it any way you want, but I want to talk about the facts." Others involve comments Buhr contends were arguments directed "to the jury's hometown feelings of loyalty," the jury's resentment of the length of the trial, and the attorney's use of a deposition.

Buhr asserts that the cumulative effect of these comments impaired his right to a fair trial and, as a result, that the District Court erred in denying his motion for a new trial. Again, we disagree.

42

"Improper argument requires reversal only when prejudice has resulted which prevented a fair trial." Moralli, 839 P.2d at 1292 (citation omitted). "Unless a level of prejudice can be shown that manifestly precludes a fair trial, then there is no reversible error." Whiting v. State (1991), 248 Mont. 207, 220-21, 810 P.2d 1177, 1186 (citation omitted).

The trial judge is in the best position to determine the prejudicial effect of an attorney's conduct. Kuhnke v. Fisher (1987), 227 Mont. 62, 68, 740 P.2d 625, 628. Here, Buhr advances a number of comments made by Wilder's counsel over the course of a six-week trial. Buhr objected to many of the comments and, in some cases, succeeded in having the question or comment rephrased or stricken. In other instances, he did not object. Moreover, the jury was instructed that, regarding "any question to which an objection was sustained, you must not conjecture as to what the answer might have been or as to the reason for the objection; nor must you draw any inference from the question itself." Given this instruction, the length of the trial, and the limited number of allegedly improper comments made, we conclude that these comments made by Wilder's attorney did not prejudice the jury or impair Buhr's right to a fair trial.

> 6. Did the cumulative effect of the asserted errors prejudice Buhr to the extent that he was unable to receive a fair trial?

Buhr contends that the cumulative effect of the errors which occurred during trial was prevention of a fair trial on the merits of his claims. Given our resolution of issues 1 through 5, we

43

conclude that this argument is without merit.

Affirmed.

_____
                                                                    Justice

We concur:

_____
                Chief Justice

_____

_____

_____

_____
                Justices

_____
The Honorable Jeffrey M. Sherlock,
District Court Judge, sitting
for Justice Terry N. Trieweiler

44

Justice James C. Nelson dissenting.

I concur with our opinion except as to our discussion of Issue 3c, and as to that issue, I respectfully dissent. I conclude that the jury's finding that Mental Health was not negligent was contrary to the law.

Section 53-21-102, MCA (1987), defines a "professional person" as either a medical doctor or a person who has been certified, as provided for in § 53-21-106, MCA, by the department of institutions. Moreover, § 53-21-105, MCA (1987), provides that "[n]o person may act in a professional capacity as provided for in [Title 53, Chapter 21, Part 1] unless he is a professional person as defined in 53-21-102."

Section 53-21-129, MCA (1987), which authorizes, under certain limited, defined circumstances, the emergency detention of a person who is seriously mentally ill, is absolutely clear and unambiguous in its mandate that the required evaluation prior to or at the time of detention be conducted by a professional person.

In that regard, it is undisputed that Russell was not a professional person, because she was not certified by the department of institutions and, yet, she was the one who did the only evaluation of Joshua that was ever conducted. The professional person, Harris, did not even see Joshua until the day following his detention, and, then, contrary to our opinion, Harris did not evaluate him; he only observed Joshua through the window of the locked door of the soft cell. Harris' conclusions that Joshua was seriously mentally ill were based, not on his evaluation, but

45

on Russell's. There is no question that, on the undisputed evidence presented to the jury, at least §§ 53-21-105, MCA (1987), and 53-21-129(1) and (2), MCA (1987), were violated by Mental Health's procedure in this case.

Furthermore, no authority is cited for the proposition that, as in this case, the evaluation required to be accomplished by the professional person can, instead, be conducted by a non-certified person who consults by telephone with the professional person. Mental Health's arguments in favor of that procedure are merely an after-the-fact justification for its failure to comply with the statute. Worse, our sanctioning that procedure sets a very dangerous precedent, indeed, and encourages mental health care providers to ignore those legislative mandates designed to insure that emergency detention is authorized by a person to whom the State has, by its certification process, entrusted the responsibility for making such important decisions.

Presumably, a person is not certified because he/she does not have the knowledge, training, experience or expertise to make the same decisions and conclusions as a certified person. Presumably, a certified person is required to make critical judgment calls because of his/her greater knowledge, training, experience and expertise. Presumably, if the procedure used in this case for the emergency evaluation and detention of this seriously mentally ill juvenile were acceptable, the legislature would have written the statutes at issue to so provide.

Unfortunately, our decision on this issue stands in stark

contrast to our previous cases which have strictly construed the requirements of § 53-21-129, MCA, in favor of the detained person. _See_, Matter of Shennum (1984), 210 Mont. 442, 684 P.2d 1073, (record did not evidence the existence of an emergency justifying commitment under § 53-21-129); Matter of M.C. (1986), 220 Mont. 437, 716 P.2d 203, (under § 53-21-129, MCA, it is the professional person, not the police officer who takes the person into custody, who determines whether the person is seriously mentally ill and should be placed into emergency detention); Matter of E.P. (1990), 241 Mont. 316, 787 P.2d 322, (failure to release involuntarily confined patient on the day after she was committed under § 53-21-129, MCA, or to file findings with the county attorney as required by the statute, deprived the person of due process).

Mental Health clearly violated duties and the standard of care imposed by the statutes at issue and, in my view, was negligent as a matter of law. Perhaps if Mental Health had simply followed the law, this whole tragic set of circumstances would not have been set in motion.

Accordingly, I respectfully dissent from our decision on Issue 3c.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissent.

_____
Justice

47

Justice William E. Hunt, Sr., dissenting.

In addition to concurring in the dissenting opinion of Justice Nelson, I want to state that I cannot agree with the result reached by the majority on the remaining issues in this case because it requires one to conclude that, in this whole tragic event, a juvenile in the custody of the State can be allowed to die in his own vomit and no one is responsible. Therefore, I dissent to the rest of the opinion.

_William E. Hunt_
Justice

48