
DA 07-0191

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 102

WILLIAM C. WILLING and NONNIE WILLING,

Plaintiffs and Appellants,

v.

ANTHONY J. QUEBEDEAUX, D.P.M.,
d/b/a HELENA FOOT SPECIALISTS,

Defendant and Appellee.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis And Clark, Cause No. XADV 2005-185
Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Terry N. Trieweiler; Trieweiler Law Firm; Whitefish, Montana

For Appellee:

Kelly Gallinger, Lisa A. Speare; Brown Law Firm, P.C.; Billings, Montana

Submitted on Briefs:  April 30, 2008

Decided:  March 31, 2009

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1   Appellants William and Nonnie Willing (Willings) alleged medical malpractice by Appellee Anthony Quebedeaux, D.P.M., (Quebedeaux) with regard to the care given by Quebedeaux on three of William Willing's toes.  A jury found in favor of Quebedeaux after a trial in the First Judicial District Court, Lewis and Clark County.  The Willings appeal the jury verdict and order of the District Court denying their motion for a new trial.  We reverse.

¶2   We restate the issues raised on appeal as follows:

¶3   1.  Did the District Court abuse its discretion by denying the Willings' request for a trial continuance and by limiting the amount of time within which to present evidence?

¶4   2.  Did the District Court abuse its discretion by denying the Willings' blanket challenge for cause of Quebedeaux's former patients and by denying the Willings' individual challenge to juror Stonehouse?

¶5   3.  Did the District Court manifestly abuse its discretion by denying Willings' motion for a new trial, which was based on asserted misrepresentations of an undisclosed textbook by defense counsel during closing arguments in violation of the court's order?

¶6   Because we reverse on the third issue, determining that the Willings' motion for a new trial should have been granted, we decline to address the remaining issues.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7   William Willing was referred to Dr. Quebedeaux, a podiatrist, in September 2001 because of right foot pain.  When he first visited Quebedeaux, Willing had a large callus

2

under the ball joint behind his big toe and had clawing of his middle three toes, to the extent that his toes were curling under themselves and his toenails were hitting the ground. Willing's toenails were thick and scarred as a result, causing him a great deal of pain. Quebedeaux provided conservative treatment to Willing for several years thereafter, which included trimming the nails, shaving calluses, administering injections, taping the second toe down to remove pressure, and padding the foot to prevent Willing's toes from rubbing on his shoe. Willing had undergone similar conservative treatment with another podiatrist since the late 1980s. Quebedeaux and Willing also discussed correcting the toes with surgery if conservative treatment failed to ameliorate the pain.

¶8    There are surgical options for treatment of a clawed toe condition. Quebedeaux recommended arthrodesis for Willing, which fuses the joints of each clawed toe in order to straighten the toe and remove pain. When an arthrodesis is performed on a clawed toe, a Kirshner wire, or "K-wire," is inserted through the middle of the phalanxes of the toe to keep it in position and allow the bones to fuse. Sizes of K-wire range from .028 inch diameter to .062 diameter. Willing consented to Quebedeaux's recommendation of arthrodesis and signed a form acknowledging possible complications from that surgery, such as loss of a toe and Reflex Sympathetic Dystrophy ("RSD"), also referred to as complex regional pain syndrome. An alternative treatment for clawed toes is arthroplasty, which involves removing bone at the head of the proximal phalanx of each clawed toe. Arthroplasties do not require use of K-wire.

3

¶9 On January 22, 2004, Quebedeaux performed an arthrodesis on the three middle toes of Willing's right foot. Quebedeaux straightened the three toes using .062 inch diameter K-wire, the largest size available. Over the next week and a half, Quebedeaux saw Willing nearly every day. Each time, Willing noted that his pain was significant but was improving. Quebedeaux tested the toes for circulation and noted good blood supply to the tips of Willing's toes. On several occasions, Quebedeaux gave Willing the option of removing the K-wires due to the pain Willing was experiencing, but warned him that doing so may compromise the alignment of the toes. Willing apparently declined. Quebedeaux never observed any discoloration of Willing's toes during those initial post-procedure visits.

¶10 On February 6, 2004, two weeks following the surgery, Willing reported for the first time that the pain in his right foot had increased. This concerned Quebedeaux, so he removed the K-wires. Quebedeaux testified that the toes "looked great" at that time, but when Willing returned three days later, on February 9, Willing's second toe had a darker discoloration, possibly caused by ischemia, or reduced blood flow to the second toe. On February 12, it was clear to Quebedeaux that Willing had some ischemia, as evidenced by a black tip covering the end of the toe. Quebedeaux treated the skin in an attempt to get it to heal as much as possible, and ultimately the ischemia ended and a boundary formed between the healthy and unhealthy tissue. On April 16, 2004, Dr. Peter Hanson, an orthopedist, performed a partial amputation on Willing's second toe to remove the dead tissue.

4

¶11 Willing experienced RSD, or chronic pain, in his right foot after the K-wires were removed and continuing after the partial amputation. Due to the partial amputation and resulting complications, Willing was discharged from his position as Colonel in the Montana Army National Guard as physically unfit to serve on May 1, 2005. The Willings filed this action on March 21, 2005, alleging that the surgery performed by Quebedeaux was not the proper surgery for Willing's condition and that his treatment and follow-up care fell below the standard of care applicable to podiatrists. The Willings alleged that as a result of Quebedeaux's negligence, Willing suffered permanent circulatory damage, permanent neurological damage, permanent deformities in his toes, and had suffered the loss of the remainder of his military career.

¶12 At trial, the parties' expert witnesses presented conflicting testimony as to the proper course of treatment for Willing's condition. Willings' podiatry expert, Dr. David Widom, testified that arthrodesis was not appropriate for Willing and the K-wires used by Quebedeaux were too large. Likewise, Dr. Sigvard Hansen, Willings' orthopedic expert, testified by videotaped deposition that the actual cause of Willing's clawed toes was tightness in Willing's calf. According to Hansen, although the arthrodesis was "ill-advised," the use of the K-wire was more the cause of the ischemia in Willing's toe than the actual arthrodesis.[1]

¶13 In contrast, Quebedeaux's podiatry expert, Dr. William Wilshire, testified that arthrodesis is the standard of care for clawed toes among orthopedic and podiatric

___

[1] Willing was referred to Dr. Sigvard Hansen for evaluation by Dr. Peter Hanson following Willing's partial toe amputation.

surgeons and that Quebedeaux's preoperative treatment and disclosures, surgery, and postoperative care were within the standard of care. Wilshire testified that the .062 inch diameter K-wire used to fuse Willing's toes was within the spectrum of sizes that were appropriate for the type of surgery Quebedeaux had performed. Wilshire based this testimony on his own professional experience and training as a surgeon, as well as on his review of literature and textbooks over the course of his practice. In fact, one such textbook relied upon by Wilshire and referred to at trial was written by Willing's expert, Dr. Sigvard Hansen. Wilshire testified that Hansen's own textbook, which he had brought with him to trial, showed "hammertoe [or clawtoe] fusion far larger than .062 K-wire specifically graphically noted in his book, two and even three times the size of a .062 K-wire, and that's in Dr. Hansen's book . . . ." Wilshire further testified that, contrary to Hansen's testimony that arthrodesis was inadvisable, Hansen's textbook indicated that he had performed arthrodesis to correct clawed toes, and had done so using screws far larger than the .062 inch K-wire used by Quebedeaux to fuse the joints.

¶14    However, Hansen's textbook had not been identified by the defense during discovery as a basis for Wilshire's opinions. Willings had requested by interrogatory that the defense "identify all literature, including . . . journals, texts or treatises upon which the Defendant intends to rely for any issue in this case." None of Quebedeaux's answers, including supplemental answers, identified Hansen's textbook. Quebedeaux's expert witness disclosure identified Wilshire and cited to two medical textbooks on which he would rely, but did not include Hansen's textbook. At his deposition, Wilshire was

6

questioned extensively about the literature on which he intended to rely, and was served with a subpoena duces tecum requiring him to produce at the deposition each "writing, article, treatise, text or written authority" upon which he relied, but Hansen's textbook was neither mentioned nor produced. Quebedeaux's list of witnesses and exhibits, which ultimately became part of the pretrial order, listed 34 exhibits, but Hansen's textbook was not listed therein.

¶15 Unable to recall during Wilshire's testimony whether Hansen's textbook had been previously disclosed, Willings' counsel checked the disclosures after trial had recessed for that day. Discovering that it had never been disclosed, Willings' counsel raised the issue prior to closing argument, notifying the District Court that Hansen's textbook had not been disclosed prior to trial. Willings' counsel noted that the textbook remained on defense counsel's table and requested that Quebedeaux's counsel be prohibited from referencing Hansen's textbook during closing arguments. Quebedeaux's counsel acknowledged that the textbook had not been disclosed and agreed not to refer to the book, but argued that he could still reference Wilshire's testimony about Hansen's book, to which Willings' counsel objected. The court then essentially ruled in Willings' favor, stating:

> I'm going to prohibit any reference to the textbook which you've already agreed to. I'm going to prohibit any reference by way of testimony of this one doctor about materials in that textbook. He can talk about the treatment. Also he can't refer back to that textbook. You cannot use him to refer back to that textbook.

7

¶16 Nonetheless, Quebedeaux's counsel made the following statement during closing argument:

> My sense is they're going to be putting a lot of distance between themselves and Sigvard Hansen after he was truly exposed for what he was going to do, and his own credibility for the type of the surgeries he was recommending; in addition to the fact that *Dr. Wilshire told you that Sigvard Hansen also does arthrodesis. He also does arthrodesis. And he uses screws that are two to three times larger than the K-Wire . . . .*

(Emphasis added.) At that point, Willings' counsel objected: "I object. There is no evidence of that, and we addressed it in the discussion prior to the closing arguments. And I would not normally interrupt a closing argument, but that's a direct violation of the Court's admonition." However, the District Court responded: "Well, I think you'll have to address it in your closing argument." Willings' counsel did not mention the comment during his rebuttal.

¶17 The jury found in favor of Quebedeaux. After trial, Willings moved for a new trial, asserting that the defense had made numerous misrepresentations about the content of Hansen's textbook, including the frequency with which Hansen actually recommends arthrodesis and Hansen's method for fixing clawed toes. Hansen submitted an affidavit after the trial averring that the content of his textbook had been misrepresented by Wilshire and Quebedeaux's counsel.

¶18 The District Court denied Willings' motion. They appeal.

## STANDARD OF REVIEW

¶19 We review a district court's denial of a M. R. Civ. P. 59 motion for a new trial on the grounds enumerated in § 25-11-102, MCA, for an abuse of discretion. *Lopez v.*

8

*Josephson*, 2001 MT 133, ¶ 16, 305 Mont. 446, 30 P.3d 326. The decision to grant or deny a new trial is within the sound discretion of the trial judge and will not be disturbed absent a showing of manifest abuse of that discretion. *Lopez*, ¶ 16. "The standard requires that the abuse of discretion be so significant as to materially affect the substantial rights of the complaining party." *Lopez*, ¶ 16.

## DISCUSSION

¶20 **Did the District Court manifestly abuse its discretion by denying Willings' motion for a new trial, which was based on asserted misrepresentations of an undisclosed textbook by defense counsel during closing arguments in violation of the court's order?**

¶21 Willings argue that defense counsel's reference to Wilshire's testimony about Hansen's textbook during closing arguments warrants a new trial pursuant to §§ 25-11-102(1), (3), and (4), MCA, and that the District Court abused its discretion in denying their motion. They assert that the textbook's content was misrepresented by Wilshire during his testimony. Hansen's textbook had not been disclosed as an exhibit or at any time during discovery, and Willings argue that the disclosure during trial caught them by surprise.

¶22 In its order denying Willings' motion for a new trial, the District Court reasoned that "[n]o reference was made by Defendant in closing about the textbook at issue. The argument made was factual and appropriate matter for Plaintiffs' rebuttal closing. Plaintiffs extrapolate argument beyond its context at the time."

¶23 Section 25-11-102, MCA, provides in pertinent part:

9

The former verdict or other decision may be vacated and a new trial granted on the application of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

(1) irregularity in the proceedings of the court, jury, or adverse party or any order of the court or abuse of discretion by which either party was prevented from having a fair trial;

.  .  .

(3) accident or surprise which ordinary prudence could not have guarded against;

(4) newly discovered evidence material for the party making the application which he could not, with reasonable diligence, have discovered and produced at the trial;

Willings argue that all three bases for a new trial exist because: (1) Quebedeaux "introduced and mischaracterized an influential textbook which had not been disclosed prior to trial . . . ;" (2) "[c]ounsel for Plaintiff was surprised by the discussion and could not have done more to guard against that surprise considering repeated requests . . . for identification of literature that would be relied upon;" and (3) "it was only after trial that counsel was in a position to review the textbook and consult with its author to determine that its contents had actually been misrepresented."

¶24 Quebedeaux responds that the Wilshire's testimony from Hansen's textbook was referenced "only briefly" in closing argument and defense counsel did not mention the textbook itself. Quebedeaux argues that a motion for new trial should only be granted in the case of "repeated, egregious conduct by counsel," and defense counsel's action in the present case did not "rise to the level of 'blatant' or 'systematic' conduct requiring reversal." Moreover, Quebedeaux argues the reference to the material in Hansen's

10

textbook during closing was not prejudicial and did not affect the outcome of the case, because Wilshire's opinion was supported by other treatises besides Hansen's textbook.

¶25 We addressed the nature of surprise and the impact upon the trial necessary to warrant a new trial under § 25-11-102(3), MCA, in *Buhr v. Flathead County*, 268 Mont. 223, 886 P.2d 381 (1994) (overruled on other grounds).[2] Pursuant thereto, we agree with Willings that they were surprised in the trial through no fault of their own, the facts were material to the outcome, they moved promptly for relief, and acted reasonably to remedy the problem. Quebedeaux argues that Willings waived their objection by failing to object during Wilshire's testimony, but Willings are not challenging the surprise testimony as much as they are challenging the defense's failure to heed the District Court's ruling entered to ameliorate the effect of the surprise testimony. Willings raised the issue before closing arguments, asking the court—not to strike the testimony from the jury's consideration—but to prohibit references in closing arguments to the textbook or testimony related to the textbook. The District Court granted that relief, but defense counsel violated that order. The violation of the court's order leads to another statutory basis for new trial, an "irregularity in the proceedings" preventing a fair trial pursuant to

---

[2] Under *Buhr*, a party moving for a new trial under this subsection must show that: "1) the moving party was actually surprised; 2) the facts causing the surprise had a material bearing on the case; 3) the verdict or decision resulted mainly from these facts; 4) the surprise did not result from the moving party's inattention or negligence; 5) the moving party acted promptly and claimed relief at the earliest opportunity; 6) the moving party used every means reasonably available at the time of the surprise to remedy it; and 7) the result of a new trial without the surprise would probably be different." *Buhr*, 268 Mont. at 253, 886 P.2d at 399.

11

§ 25-11-102(1), MCA. Beyond the initial surprise, Willings also sustained the loss of the mid-trial remedy they had requested and obtained.

¶26 Although Quebedeaux argues that the violation consisted only of a brief comment, defense counsel's few words were well placed. He referred to the arthrodesis techniques Hansen describes in the textbook, implied to the jury that Hansen regularly performed arthrodesis on patients with Willing's condition, and in doing so used fixation devices three times the size of the K-wires Quebedeaux had used. Quebedeaux's argument that Willings were not prejudiced by the violation of the District Court's order because Wilshire's testimony was supported by other treatises fails to acknowledge the advantage obtained by the defense in offering Hansen's own work. Contradicting an expert's testimony, not by another's opinion, but by the expert's own writings, is a significant trial development with potentially devastating impact to the side offering that expert's opinion. Here, the testimony about Hansen's textbook directly contradicted Hansen's videotaped deposition testimony. Defense counsel found it irresistible to argue to the jury that Hansen "also does arthrodesis . . . [a]nd he uses screws that are two to three times larger than the K-Wire." The only source for these statements was Hansen's textbook, forcing Willings' counsel to object on the ground that "[t]here is no evidence of that, and we addressed it in the discussion prior to the closing arguments."

¶27 However, the District Court did not intervene. Requiring the Willings to respond to the defense comments during their closing rebuttal did nothing to resolve the prejudice to them, because they had nothing to respond with. The failure to disclose the textbook

12

had deprived Willings of the opportunity to provide counter evidence during the trial, or to prepare cross examination about the textbook, leaving them with nothing to argue in rebuttal to defense counsel's closing. Only after the trial did they have the opportunity to summon resources in opposition to Wilshire's surprise testimony.

¶28   We believe the reference to the textbook was significant and that Willings were denied a fair trial by its surprise use, by the defense's violation of the court's order prohibiting further references, and by the District Court's failure to enforce its order upon Willings' counsel's objection during closing argument. We conclude the District Court manifestly abused its discretion by denying Willings' motion for a new trial. We reverse and remand for a new trial.

/S/ JIM RICE

We concur:

/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS

13